# MOUNTAIN STATES TELEPHONE & TELEGRAPH CO. *v.* PUEBLO OF SANTA ANA

No. 84–262.   Argued February 20, 1985—Decided June 10, 1985

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 255. POWELL, J., took no part in the decision of the case.

*Kathryn Marie Krause* argued the cause for petitioner. With her on the briefs were *William H. Allen* and *Russell H. Carpenter, Jr.*

*Scott E. Borg* argued the cause for respondent. With him on the brief was *Richard W. Hughes.**

JUSTICE STEVENS delivered the opinion of the Court.

In 1928, Mountain States Telephone and Telegraph Company purchased an easement from the Pueblo of Santa Ana for a telephone line. Mountain States contends that the conveyance of this easement was valid under § 17 of the Pueblo Lands Act of 1924, 43 Stat. 641, because it was "first approved by the Secretary of the Interior."[1] The Pueblo contends that § 17 only authorizes such transfers "as may hereafter be provided by Congress," and that Congress never provided legislation authorizing the conveyance of Pueblo lands with the approval of the Secretary. Both constructions find some support in the language of § 17.

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Lee, F. Henry Habicht II, Deputy Solicitor General Claiborne, Edwin S. Kneedler,* and *Robert L. Klarquist;* for the State of New Mexico by *Paul Bardacke,* Attorney General, *Charlotte Uram* and *Bruce Thompson,* Assistant Attorneys General, and *Hugh W. Parry,* Special Assistant Attorney General; for the City of Escondido et al. by *John R. Schell, Kent H. Foster, Paul D. Engstrand,* and *Donald R. Lincoln;* for Atchison, Topeka and Santa Fe Railway Co. by *Gus Svolos, John R. Cooney, Lynn H. Slade,* and *John S. Thal;* and for Public Service Company of New Mexico by *Robert H. Clark.*

Briefs of *amici curiae* urging affirmance were filed for the All Indian Pueblo Council et al. by *L. Lamar Parrish* and *Catherine Baker Stetson;* for the Pueblo de Acoma by *Peter C. Chestnut;* and for the Pueblo of Taos by *William C. Schaab.*

[1] 43 Stat. 641. See *infra,* at 246, for the complete text of § 17.

240

# I

Congress enacted the 1924 legislation "to provide for the final adjudication and settlement of a very complicated and difficult series of conflicting titles affecting lands claimed by the Pueblo Indians of New Mexico."[2] The Committee Reports review the unique and "interesting history of the Pueblo Indians"[3] and explain why special remedial legislation was necessary.

"These Indians were found by Coronado and the first Spanish explorers in 1541, many of them residing in villages and occupying the same lands that the Pueblo Indians now occupy."[4] From the earliest days, the Spanish conquerors recognized the Pueblos' rights in the lands that they still occupy,[5] and their ownership of these lands was confirmed in land grants from the King of Spain. Later, the independent Government of Mexico extended limited civil and political rights to the Pueblo Indians, and confirmed them in the ownership of their lands.

The United States acquired the territory that is now New Mexico in 1848 under the Treaty of Guadalupe-Hidalgo.[6] During the period between 1848 and 1910, when New Mexico became a State, inhabitants of that territory—and members of the bar who advised them—generally believed that the Pueblo Indians had the same unrestricted power to dispose of their lands as non-Indians whose title had originated in Spanish grants. This view was supported by decisions of the

---

[2] S. Rep. No. 492, 68th Cong., 1st Sess., 3 (1924).

[3] *Ibid.* The House Report incorporates the Senate Report in verbatim text. H. R. Rep. No. 787, 68th Cong., 1st Sess. (1924).

[4] S. Rep. No. 492, at 3.

[5] The 1924 Act affected "20 Pueblos . . . with a total Indian population of between 6,500 and 8,000. Each Pueblo consists of about 17,000 acres of land within its exterior boundaries, or a total of 340,000 acres in all." *Ibid.*

[6] Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic, 9 Stat. 922.

Supreme Court of the Territory of New Mexico,[7] and by this Court's square holding in *United States* v. *Joseph*, 94 U. S. 614 (1877),[8] that the Pueblo Indians were not an "Indian tribe" protected by the Nonintercourse Act.[9]  As a result, it

[7] *United States* v. *Lucero*, 1 N. M. 422 (1869); *Pueblo of Nambe* v. *Romero*, 10 N. M. 58, 61 P. 122 (1900); cf. *United States* v. *Mares*, 14 N. M. 1, 88 P. 1128 (1907).

[8] In concluding that the Pueblos were excluded from the coverage of the Nonintercourse Act, the Court primarily relied upon its understanding of Pueblo culture:

" 'For centuries . . . the pueblo Indians have lived in villages, in fixed communities, each having its own municipal or local government. . . . [T]hey are a peaceable, industrious, intelligent, honest, and virtuous people.   They are Indians only in feature, complexion, and a few of their habits; in all other respects superior to all but a few of the civilized Indian tribes of the country, and the equal of the most civilized thereof. . . .'

". . . When it became necessary to extend the laws regulating intercourse with the Indians over our new acquisitions from Mexico, there was ample room for the exercise of those laws among the nomadic Apaches, Comanches, Navajoes, and other tribes whose incapacity for self-government required both for themselves and for the citizens of the country this guardian care of the general government.

"The pueblo Indians, if, indeed, they can be called Indians, had nothing in common with this class.   The degree of civilization which they had attained centuries before, their willing submission to the laws of the Mexican government . . . and their absorption into the general mass of the population . . . all forbid the idea that they should be classed with the Indian tribes for whom the intercourse acts were made . . . ."   *United States* v. *Joseph*, 94 U. S., at 616–617 (quoting *United States* v. *Lucero*, 1 N. M., at 453).

[9] The current version of the Nonintercourse Act was enacted as § 12 of the Trade and Intercourse Act of 1834:

"[N]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."   4 Stat. 730, 25 U. S. C. § 177.

Section 12 of the 1834 Act is the last in a series of enactments beginning with § 4 of the Indian Trade and Nonintercourse Act of 1790.   1 Stat. 138.  See *County of Oneida* v. *Oneida Indian Nation of New York*, 470 U. S. 226, 231–232 (1985).   In 1851, Congress extended the provisions of

was thought that the Pueblo Indians could convey good title to their lands notwithstanding the Act's prohibition of any "purchase, grant, lease, or other conveyance of lands . . . from any . . . tribe of Indians." 4 Stat. 730, 25 U. S. C. § 177.

The prevailing opinion concerning the unique status of the Pueblo Indians was drawn into question as a result of the attempt by federal authorities to regulate the liquor trade with the Pueblos. They orginally brought charges under an 1897 criminal statute prohibiting the sale of liquor to any "Indian."[10] Relying on *Joseph*, however, the Territorial Supreme Court held, in 1907, that the Pueblos were not "Indians" within the meaning of the statute.[11] In response, the New Mexico Enabling Act of 1910 expressly required that the new State's Constitution prohibit "the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico."[12] In *United States* v. *Sandoval*, 231 U. S. 28 (1913), the Court noted that whatever doubts there previously were about the applicability of the Indian liquor statute to the Pueblos, "Congress, evidently wishing to make sure of a different result in the future, expressly declared" in the Enabling Act that "it should include them." 231 U. S., at 38.

The narrow question decided in the *Sandoval* case was that the dependent status of the Pueblo Indians was such that Congress could expressly prohibit the introduction of intoxicating liquors into their lands under its power "To regulate Commerce . . . with the Indian Tribes." U. S. Const., Art. I, § 8, cl. 3. In reaching that decision, however, the Court

---

"the laws now in force regulating trade and intercourse with the Indian tribes" to "the Indian tribes in the Territor[y] of New Mexico." 9 Stat. 587.

[10] 29 Stat. 506.

[11] *United States* v. *Mares*, 14 N. M., at 4, 88 P., at 1129.

[12] 36 Stat. 558.

rejected the factual premises that had supported its judgment in *Joseph*,[13] and suggested that "the observations there made respecting the Pueblos were evidently based upon statements in the opinion of the territorial court, then under review, which are at variance with other recognized sources of information, now available, and with the long-continued action of the legislative and executive departments." 231 U. S., at 49. The Court's disapproval of *Joseph* strongly implied that the restraints on alienation contained in the Nonintercourse Act—as well as the liquor statute—might apply to the Pueblos. As a result, the validity of all non-Indian claims to Pueblo lands was placed in serious doubt.

Relying on the rule established in *Joseph*, 3,000 non-Indians had acquired putative ownership of parcels of real estate located inside the boundaries of the Pueblo land grants.[14] The Court's decision in *Sandoval* cast a pall over all these titles by suggesting that the Pueblos had been wrongfully dispossessed of their lands, and that they might have the power to eject the non-Indian settlers.[15] After

---

[13] "[B]y an uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the Government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes, and, considering their Indian lineage, isolated and communal life, primitive customs and limited civilization, this assertion of guardianship over them cannot be said to be arbitrary but must be regarded as both authorized and controlling." 231 U. S., at 47.

[14] "These hearings disclosed that there are now approximately 3,000 claimants to lands within the exterior boundaries of the Pueblo grants. The non-Indian claimants with their families comprise about 12,000 persons. With few exceptions, the non-Indian claims range from a town lot of 25 feet front to a few acres in extent. It was stated, however, in the hearings by all parties that probably 80 percent of the claims are not resisted by the Indians and only about 20 percent of the number will be contested." S. Rep. No. 492, at 5.

[15] "The fact that the United States may . . . at any time in the future take steps to oust persons in possession of lands within these Pueblo grants, and the continuing uncertainty as to title, has cast a cloud on all lands held by

conducting extensive hearings on the problem,[16] Congress drafted and enacted the Pueblo Lands Act of 1924. The stated purpose of the Act was to "settle the complicated questions of title and to secure for the Indians all of the lands to which they are equitably entitled." S. Rep. No. 492, 68th Cong., 1st Sess., 5 (1924).

## II

Under the Act, a Public Lands Board, composed of the Secretary of the Interior, the Attorney General, and a third person to be appointed by the President of the United States, was established to determine conflicting claims to the Pueblo lands. § 2, 43 Stat. 636. The Board was instructed to issue a report setting forth the metes and bounds of the lands of each Pueblo that were found not to be extinguished under the rules established in the Act. *Ibid.* Continuous, open, and notorious adverse possession by non-Indian claimants, coupled with the payment of taxes from 1889 to the date of enactment in 1924, or from 1902 to 1924 if possession was under color of title, sufficed to extinguish a Pueblo's title. § 4.[17]

---

white people within the Pueblo areas. . . . The mortgage value of the lands is almost nothing; [and] sales, leases, and transfers have been discontinued . . . ." Hearings on S. 3865 and S. 4223 before the Subcommittee Considering Bills Relative to the Pueblo Indian Lands of the Senate Committee on Public Lands and Surveys, 67th Cong., 4th Sess., 51 (1923) (Senate Hearings) (report submitted with the testimony of R. E. Twitchell, Special Assistant to the Attorney General).

[16] *Ibid.;* Hearings on H. R. 13452 and H. R. 13674 before the House Committee on Indian Affairs, 67th Cong., 4th Sess. (1923).

[17] The Act itself did not purport to resolve the question whether the Nonintercourse Act applied to the Pueblos; § 4 provided that the statutes of limitations in that section were "in addition to any other legal or equitable defenses which [the claimants] may have or have had under the laws of the Territory and State of New Mexico." 43 Stat. 637. In November 1924 the Government docketed an appeal in this Court arguing that the Pueblos had always been wards of the United States, and that adverse judgments entered in 1910 and 1916 in quiet title actions brought by the Pueblo of Laguna could not bar a later quiet title action brought by the United States

The Board's reports were to be implemented by suits to quiet title in the United States District Court for the District of New Mexico. §§ 1, 3.

The Act also directed the Board to award the Pueblos compensation for the value of any rights that were extinguished if they "could have been at any time recovered for said Indians by the United States by seasonable prosecution." § 6. Settlers who had occupied their lands in good faith, but whose claims were rejected, might receive compensation for the value of any improvements they had erected on their lands, or for the full value of their lands if they had purchased those lands and entered them before 1912 under a deed purporting to convey title. §§ 7, 15.

After the Board determined who owned each parcel of land, the Act foresaw that some consolidation of each Pueblo's land holdings might occur. The Board was directed to identify any parcels adjacent to a Pueblo settlement that should be purchased from non-Indian owners for transfer to the Pueblo. § 8. In addition, § 16 of the Act authorized the Secretary of the Interior, with consent of the Pueblo, to sell any lands owned by the Pueblo that were "situate among lands adjudicated or otherwise determined in favor of non-

---

on the Pueblo's behalf concerning the same parcel of real estate. The Government filed a motion to expedite consideration of the case, informing the Court of the enactment of the Pueblo Lands Act, and noting that "[t]he Chairman [of the Pueblo Lands Board] has informed the Attorney General that an early determination of this case will be helpful to the Board in the discharge of its duties and functions under this Act." Motion to Advance of United States, O. T. 1925, No. 208, p. 2. In holding that the quiet title action was not barred, the Court expressly observed that the Pueblos were "Indian tribes" within the meaning of the Nonintercourse Act. *United States* v. *Candelaria*, 271 U. S. 432, 441–442 (1926). The practical result was that non-Indian claimants to Pueblo lands could only raise the defenses set out in § 4. Unlike *Candelaria*, the present controversy involves a transaction that occurred after the passage of the Pueblo Lands Act and which is therefore governed by § 17.

Indian claimants and apart from the main body of the Indian land."[18]

The foregoing provisions of the Pueblo Lands Act were all designed to settle the consequences of past transactions. In contrast, the section we must construe in this case—§ 17— was entirely concerned with transactions in Pueblo lands that might occur in the future. It provides:

> "No right, title, or interest in or to the lands of the Pueblo Indians of New Mexico to which their title has not been extinguished as hereinbefore determined shall hereafter be acquired or initiated by virtue of the laws of the State of New Mexico, or in any other manner except as may hereafter be provided by Congress, *and* no sale, grant, lease of any character, or other conveyance of lands, or any title or claim thereto, made by any pueblo as a community, or any Pueblo Indian living in a community of Pueblo Indians, in the State of New Mexico, shall be of any validity in law or in equity unless the same be first approved by the Secretary of the Interior." 43 Stat. 641–642 (emphasis added).

---

[18] The complete text of § 16 provides:

"That if any land adjudged by the court or said lands board against any claimant be situate among lands adjudicated or otherwise determined in favor of non-Indian claimants and apart from the main body of the Indian land, and the Secretary of the Interior deems it to be for the best interest of the Indians that such parcels so adjudged against the non-Indian claimant be sold, he may, with the consent of the governing authorities of the pueblo, order the sale thereof, under such regulations as he may make, to the highest bidder for cash; and if the buyer thereof be other than the losing claimant, the purchase price shall be used in paying to such losing claimant the adjudicated value of the improvements aforesaid, if found under the provisions of section 15 hereof, and the balance thereof, if any, shall be paid over to the proper officer, or officers, of the Indian community, but if the buyer be the losing claimant, and the value of his improvements has been adjudicated as aforesaid, such buyer shall be entitled to have credit upon his bid for the value of such improvements so adjudicated."

The question to be decided here is whether the second clause—the language following the word "and"—indicates that a Pueblo may convey good title to its lands with the approval of the Secretary of the Interior.

## III

In 1905 Mountain States' predecessor allegedly acquired a right-of-way and constructed a telephone line across land owned by the Pueblo of Santa Ana. App. 8. Presumably the 1905 conveyance would have been invalid under the Nonintercourse Act. See n. 17, *supra*. In all events, in 1927 the United States, acting as guardian for the Pueblo of Santa Ana, brought an action in the United States District Court for the District of New Mexico to quiet title to the lands of that Pueblo.

While the litigation was pending, the Pueblo entered into a right-of-way agreement with Mountain States granting it an easement "to construct, maintain and operate a telephone and telegraph pole line" on the land now in dispute. App. 39.[19] The agreement was forwarded to the Secretary of the Interior by the Bureau of Indian Affairs with the recommendation that it be approved under § 17. *Id.*, at 181–183. This agreement was approved, and the approval was received, and endorsed on the right-of-way agreement. *Id.*, at 43. On the Government's motion,[20] *id.*, at 36, the District Court thereafter dismissed Mountain States from the quiet title

---

[19] The consideration paid for the easement was $101.60 or 80 cents a pole for 127 poles. App. 181.

[20] The Government's motion read in part:

"[S]ubsequent to the institution of this suit [Mountain States] has obtained a deed from the Pueblo of Santa Ana approved April 13, 1928, by the Secretary of the Interior in accordance with Section 17 of the Pueblo Lands Act of June 7, 1924, and . . . thereby [Mountain States] has obtained, for an adequate consideration, good and sufficient title to the right of way in controversy herein between [the Pueblo] and [Mountain States]." *Id.*, at 36.

action on the ground that it had "secured good and sufficient title to the right of way and premises in controversy . . . in accordance with the provisions of Section 17 of the Pueblo Lands Act." [21]

Mountain States removed the telephone line in 1980. On October 10 of that year, the Pueblo brought this action claiming trespass damages for the period prior to the removal of the line. The District Court granted partial summary judgment for the Pueblo on the issue of liability, holding that the grant of the right-of-way in 1928 was not authorized by § 17. *Id.*, at 86–92.

The Court of Appeals allowed an interlocutory appeal under 28 U. S. C. § 1292(b) and affirmed. 734 F. 2d. 1402 (CA10 1984). The court held that Pueblo lands were protected by the Nonintercourse Act prior to 1924 and that § 17 of the Pueblo Lands Act did not authorize any conveyance of such lands. It reasoned:

"The two clauses of § 17 of the Pueblo Lands Act are joined by the conjunctive 'and.' To us that means exactly what it says. No alienation of the Pueblo lands shall be made 'except as may hereafter be provided by Congress' *and* no such conveyance 'shall be of any validity in law or in equity unless the same be first approved by the Secretary of the Interior.' Two things are required. First, the lands must be conveyed in a manner provided by Congress. Second, the Secretary of the Interior must approve. As to the first, at the time of the agreement between the Pueblo and [Mountain States], Congress had provided nothing. Hence, the first condition was not met. The fact that Congress had provided

---

[21] *Id.*, at 37. Mountain States has argued that the 1928 dismissal precludes the Pueblo from challenging the validity of the 1928 right-of-way agreement. Brief for Petitioner 39–47. The Court of Appeals held that the dismissal of the quiet title action in 1928 was not a ruling on the merits that would bar this action. 734 F. 2d 1402, 1407–1408 (CA10 1984). In view of our disposition of the case, however, we do not evaluate the merits of this contention.

no method makes the approval of the Secretary meaningless. The operation of the second clause depends on compliance with the first clause." *Id.*, at 1406.

The Court of Appeals considered and rejected Mountain States' reliance on the legislative history of the 1924 Act and its construction by the Secretary of the Interior.

Our concern that the Court of Appeals' interpretation of the Act might have a significant effect on other titles acquired pursuant to § 17 led us to grant certiorari. 469 U. S. 879 (1984). We now reverse.

## IV

The word "hereafter" in the first clause of § 17 supports the Court of Appeals' interpretation of the Act. Read literally, the statute seems to state unequivocally that no interest in Pueblo lands can be acquired "except as may hereafter be provided by Congress"—or, stated somewhat differently, until Congress enacts yet another statute concerning the lands of the Pueblo Indians of New Mexico.

The problem with this construction of the statute is that the requirement of the Secretary's approval in the second clause of § 17 would be a nullity until Congress acts. Even if a later Congress did enact another statute authorizing the alienation of Pueblo lands, that Congress would be entirely free to accept or reject that requirement. Neither the Pueblo nor the Court of Appeals has offered any plausible reason for attributing this futile design to the 68th Congress. In light of "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative," *Colautti* v. *Franklin*, 439 U. S. 379, 392 (1979), the second clause of § 17 cannot be read as limiting the power of Congress to legislate in the "hereafter."[22]

---

[22] Congress did pass Acts in 1926, 44 Stat. 498 and 1928, 45 Stat. 442, authorizing the condemnation of rights-of-way over Pueblo lands, but these Acts were enacted in response to Pueblos that refused to make voluntary conveyances of easements to utilities and common carriers. See H. R. Rep. No. 955, 69th Cong., 1st Sess., 2 (1926). Thus, the 1926 and 1928

The Court of Appeals' literal interpretation of the first clause of § 17 would also nullify the effect of § 16. See n. 18, *supra*. The design of the Pueblo Lands Act indicates that Congress thought some consolidation of Pueblo land holdings might be desirable in connection with the claims settlement program to be promptly implemented by the Pueblo Lands Board. See *supra*, at 245–246. To this end, § 16 purports to authorize conveyances of Pueblo lands with the consent of the governing authorities of the Pueblo and the approval of the Secretary of the Interior. If the Court of Appeals' literal construction of § 17 were accepted, the consolidation of properties foreseen by § 16 could have been implemented only as Congress might thereafter provide. It is inconceivable that Congress would have inserted § 16 in the comprehensive settlement scheme provided in the Act if it did not expect it to be effective forthwith.

Finally, the practical effect of the Court of Appeals' interpretation is to apply the requirements of the Nonintercourse Act to voluntary transfers of Pueblo lands. In 1924, Congress logically could have adopted any of three approaches to voluntary transfers. It could have left the matter to be decided by the courts; applied the rule of the Nonintercourse Act; or adopted a new rule of law. A review of the structure of the statute convinces us that Congress followed the last course.

In arguing that § 17 simply extended the provisions of the Nonintercourse Act to the Pueblos, the Pueblo relies on language in the first clause of the section. However, it is the second—not the first—clause of § 17 that closely resembles the language and structure of the Nonintercourse Act:

Section 17:

"[N]o sale, grant, lease of any character, or other conveyance of lands, or any title or claim thereto, made by any

---

Acts were designed to supplement the authority provided in the second clause of § 17, not replace it.

pueblo as a community, or any Pueblo Indian living in a community of Pueblo Indians, in the State of New Mexico, shall be of any validity in law or in equity unless the same be first approved by the Secretary of the Interior."

Nonintercourse Act:

"[N]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."

The language is slightly—but significantly—altered to provide for approval by the Secretary of the Interior instead of ratification by Congress.

In any case, if Congress had intended to apply the Nonintercourse Act to these lands, it is difficult to understand why it did not say so in simple language. When Congress considered it appropriate in the Act to extend generally applicable Indian statutes to the Pueblos it did so with concise language directed to that end.[23] Indeed, in view of subsequent events, Congress might have achieved that result simply by omitting § 17 from the Act and leaving the matter to the courts. See n. 17, *supra*. In our view, it is much more likely that Congress intended to authorize a different procedure for Pueblo lands in view of their unique history—a history that is discussed at some length in the Committee Reports.[24]

---

[23] For example, § 4 of the Act recognized that a Pueblo might bring its own action to quiet title *"Provided, however,* That any contract entered into with any attorney or attorneys by the Pueblo Indians of New Mexico, to carry on such litigation shall be subject to and in accordance with existing laws of the United States." 43 Stat. 637; S. Rep. No. 492, at 7.

[24] Francis Wilson, a representative for the Pueblos, apparently originated the first draft of § 17. In a letter to the Commissioner of Indian Affairs he explained that "Section 17 of the Bill is, we think the shortest way to prevent present conditions from recurring or existing again. . . . This section is intended to cover the same ground as [the Nonintercourse Act] but it is changed so as to accord with the conditions of the Pueblo Indians." App. to Brief in Opposition 12.

## V

There is another reading of the statute that better harmonizes the two clauses of § 17 with the structure of the entire Act and with "its contemporary legal context." [25]   After the *Joseph* decision, it was generally assumed that questions of title to Pueblo lands were to be answered by reference to New Mexico law, rather than to federal law.   In 1924, Congress was legislating without the benefit of a clear holding from this Court that the Pueblos had been completely assimilated to the status of Indian tribes whose land titles were protected by federal law.   *Sandoval* had established that the Indian liquor law applied to the Tribe, and had strongly implied that the Nonintercourse Act would also apply; but Congress surely wanted to make clear that state law, for the future, was entirely pre-empted in this area, and that Congress had assumed complete jurisdiction over these lands.   The first clause of § 17 is fairly read as a flat prohibition against reliance on New Mexico law in connection with future transactions involving Pueblo lands.   After 1924, alienation of those lands, voluntary or involuntary, was only to occur if sanctioned by federal law.

While the first clause of § 17 refers generally to the acquisition of any "right, title, or interest in . . . lands of the Pueblo Indians," the second clause refers to any "sale, grant, lease . . . or other conveyance of lands."   This language plainly refers to transfers of land freely made by a Pueblo. The second clause of § 17 is logically interpreted as providing a firm command, as a matter of federal law, that no future conveyance should be valid without the approval of the Secretary of the Interior.   The language suggests that Congress assumed that the Secretary of the Interior could adequately protect the interests of the Pueblos in connection with future land transactions.   This construction is supported by the language of § 16 allowing for the consolidation of Pueblo lands

---

[25] See *Cannon* v. *University of Chicago*, 441 U. S. 677, 699 (1979).

with the consent of the Pueblo and if "the Secretary of the Interior deems it to be for the best interest of the Indians."[26]

This interpretation of § 17 gives both clauses a meaning that is consistent with the remainder of the statute and with the historical situation of the Pueblos.[27]  It is consistent with the limited legislative history available,[28] and is supported by

[26] The Pueblo argues that the specific authority conferred by § 16 would be superfluous if § 17 is interpreted as generally authorizing conveyances with the approval of the Secretary.  Provisions similar to § 16, however, were contained in early versions of the bill that did not contain § 17, see S. Rep. No. 1175, 67th Cong., 4th Sess., 5 (1923); H. R. Rep. No. 1730, 67th Cong., 4th Sess., 3, 7 (1923), and it was probably considered to be an isolated element in the comprehensive claims settlement procedure established by the Act, rather than a provision of general applicability like § 17. Section 16 was also no doubt designed to encourage the Secretary to take the initiative in urging the Pueblos to consolidate their land holdings after the Board's work was completed.

[27] The word "hereafter" in the first clause of § 17 remains a puzzle even under this interpretation.  It may be that Congress inadvertently used the word "hereafter" when it intended to say "herein" or "hereinafter"; or perhaps when the word "hereafter" was included in the bill, the subsequent date of enactment might have been regarded as part of the "hereafter." In any case, this ambiguity in the first clause of § 17 does not alter the clarity of the rule of law established in the second.

[28] During the Senate Hearings the Chairman of the Subcommittee considering the bills on the Pueblo lands problem referred to the desirability of authorizing the Pueblos to convey their lands with the approval of the Secretary:

"Senator LENROOT.  Have we not general legislation that provides for the alienation of Indian lands with the consent of the Secretary of the Interior?

"Commissioner BURKE.  Certainly, as to all Indians, except the Pueblos.

"Senator LENROOT.  They are not included in the statute?

"Commissioner BURKE.  No; and no tribal lands can be alienated except by act of Congress.  This land is not allotted.

. . . . .

"Mr. WILSON [representing Pueblos].  There is special legislation covering [the Five Civilized Tribes], and in the *Sandoval* case the court, in speaking of the tenure to lands of the Pueblo tenants, compared them directly with the tenure of the Five Civilized Tribes.  That is patented land, but there was a parallel drawn in the mind of the court, which intended to

the contemporaneous opinion of the Secretary of the Interior and the Federal District Judge who placed a stamp of approval on this transaction and numerous others in the years following the enactment of the Pueblo Lands Act in 1924.[29] The uniform contemporaneous view of the Executive Officer responsible for administering the statute and the District Court with exclusive jurisdiction over the quiet title actions brought under the Pueblo Lands Act[30] "is entitled to very great respect."[31] These individuals were far more likely to

---

convey the idea that the Pueblo lands could be handled in precisely the same way as the land of the Five Civilized Tribes.

"Senator LENROOT. I should like to have you consider whether it might not [be] advisable to provide that these lands may be sold or alienated with the consent of both the Pueblo and the Secretary of the Interior.

"Mr. WILSON. That is probably going to be quite desirable under some conditions. In fact we have at different times rather encouraged the idea that if they could make swaps and transfers they could get their lands into much better condition. In fact that was the policy at one time that we had with reference to it.

"Senator LENROOT. Mr Commissioner, would there be any objection to that on the part of the Government.

"Commissioner BURKE. I do not think so. I think there should be authority so that where it was in the interest of the Indians, they might convey, but I would have it under strict supervision of the Department." Senate Hearings, at 155.

Sections 16 and 17, authorizing conveyances of Pueblo lands with the approval of the Secretary of the Interior, appeared in later versions of the bill. See also n. 24, *supra*.

[29] In 1926, a Special Assistant to the Attorney General offered the same construction of the second clause of § 17 that we adopt today. See App. to Brief for Petitioner 3a–4a. As a result of this construction, the Secretary approved at least 8 other conveyances involving the Pueblo of Santa Ana, between 1926 and 1958, App. 112–115, 129–180, and more than 50 involving other Pueblos. Many of the early transactions also involved dismissals from quiet title actions brought by the United States under the Pueblo Lands Act. See Brief for United States as *Amicus Curiae* 23; *supra*, at 247–248.

[30] §§ 1, 3, 43 Stat. 636.

[31] *Edwards' Lessee* v. *Darby*, 12 Wheat. 206, 210 (1827). See also *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450–451 (1978); *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 315 (1933).

have had an understanding of the actual intent of Congress than judges who must consider the legal implications of the transaction over half a century after it occurred.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Section 17 of the Pueblo Lands Act of 1924, 43 Stat. 641–642, provides in full:

"No right, title, or interest in or to the lands of the Pueblo Indians of New Mexico to which their title has not been extinguished as hereinbefore determined shall hereafter be acquired or initiated by virtue of the laws of the State of New Mexico, or in any other manner except as may hereafter be provided by Congress, and no sale, grant, lease of any character, or other conveyance of lands, or any title or claim thereto, made by any pueblo as a community, or any Pueblo Indian living in a community of Pueblo Indians, in the State of New Mexico, shall be of any validity in law or in equity unless the same be first approved by the Secretary of the Interior."

This awkward and obscure provision is a striking illustration of the fact that statutory phraseology sometimes is "the consequence of a legislative *accident*, perhaps caused by nothing more than the unfortunate fact that Congress is too busy to do all of its work as carefully as it should." *Delaware Tribal Business Committee* v. *Weeks*, 430 U. S. 73, 97 (1977) (STEVENS, J., dissenting) (emphasis added). Section 17's opaque language has given rise to not just two conflicting interpretations, but to literally a multitude of proffered readings— each of which attempts to rationalize the ambiguous words, phrases, and clauses and to explain away apparently incon-

sistent or inoperative language, and each of which ultimately fails to meld the language into a coherent whole.[1]   This muddle is perhaps best illustrated by the fluctuating construction given to § 17 by the Department of the Interior over the past 60 years.   See *infra*, at 270–275.   And while the Court offers up its own attempt to "harmoniz[e]" the anomalies of § 17, *ante*, at 252, it must ultimately concede that some aspects of § 17 "remai[n] a puzzle even under [its] interpretation," *ante*, at 253, n. 27.

I would have thought that the Court, in attempting to drain this statutory bog, would turn naturally to the canons of construction that have governed Indian-law questions for the past two centuries—canons designed specifically to resolve ambiguities in construing provisions such as § 17, and which grow directly out of the federal trust responsibilities that define the conduct of Congress, executive officials, and the courts with respect to Indian tribes.[2]   Instead, the Court wholly ignores these canons and boldly pronounces its own revisionist interpretation of the statute that goes far beyond even the Government's current reading.   Under the Court's view, Congress intended by § 17 to give the 19 Pueblo Tribes a power possessed by *no* other Indian tribe—the power to alienate their *unalloted* tribal lands freely without any restrictions, subject only to the approval of the Secretary of the Interior, and without any guidelines respecting the

---

[1] See, *e. g.*, Brief for Petitioner 16–32; Brief for Respondent 12–32; Brief for United States as *Amicus Curiae* 11–16; Brief for Atchison, Topeka and Santa Fe Railway Co. as *Amicus Curiae* 9–16; Brief for Public Service Co. of New Mexico as *Amicus Curiae* 11–18; Brief for State of New Mexico as *Amicus Curiae* 3–7; Brief for Pueblo of Taos as *Amicus Curiae* 5–21; Brief for Pueblo de Acoma as *Amicus Curiae* 11–13; Brief for All Indian Pueblo Council et al. as *Amici Curiae* 7–20.

[2] See, *e. g.*, *United States* v. *Mitchell*, 463 U. S. 206, 225 (1983); *Tulee* v. *Washington*, 315 U. S. 681, 684–685 (1942); *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831).   See generally F. Cohen, Handbook of Federal Indian Law 220–228 (1982) (Cohen).

manner, scope, requirements, or timing of the Secretary's supervision.

I dissent. I believe § 17 more plausibly is read simply as an attempt by Congress to reaffirm and clarify the full applicability to the Pueblo Tribes of general federal restraints against alienation of Indian lands and the exceptions thereto. This interpretation better reflects the structure of the Pueblo Lands Act and the spirit in which it was enacted. The Court's interpretation, on the other hand, flies in the face of both the Pueblo Lands Act and of legislation enacted prior to and after the Act; misconstrues the legislative history; overlooks evidence concerning the origins and consistency of the administrative interpretation to which the Court now purports to defer; and flouts the fiduciary relationship owed to Indian tribes and the canons of construction that serve to preserve that relationship.

I

As the Court acknowledges, § 17 must be examined in light of "'its contemporary legal context.'" *Ante,* at 252. Alienation of Indian lands, in 1924 as now, was governed by the principles of the Nonintercourse Act, which provides that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."[3] Congress ceased entering into treaties with Indian tribes in 1871,[4] but the Nonintercourse Act has continued to define the essential characteristics of Indian title in this country: that all questions concerning Indian property are pre-empted by federal law, and that interests in

---

[3] Trade and Intercourse Act of 1834, § 12, Rev. Stat. § 2116, 25 U. S. C. § 177.

[4] Appropriations Act of Mar. 3, 1871, § 1, Rev. Stat. § 2079, 25 U. S. C. § 71. See also *FPC* v. *Tuscarora Indian Nation,* 362 U. S. 99, 118–124 (1960).

Indian lands can be conveyed only pursuant to explicit congressional authorization.[5]

Since 1871, Congress has permitted interests in unallotted Indian lands to be conveyed in two ways: first, through specific statutes authorizing alienation of particular tribal lands; and second, through general statutes authorizing the transfer of limited interests in Indian lands subject to the approval of the Secretary of the Interior.[6] A number of statutes in this second category were enacted at the end of the 19th century and early in the 20th century, and authorized such limited conveyances as leases for farming, grazing, and oil, gas, and mineral development; rights-of-way for highways, railways, and utilities; and sales of timber.[7] These statutes typically placed strict limits on the Secretary's authority by, *inter alia*, prescribing the price and term of years for which interests could be conveyed, providing for the collection of special taxes and royalties for the benefit of the affected tribes, placing restrictions on the geographic scope of conveyances, establishing procedural safeguards for the tribal owners, and requiring the promulgation of rules and regulations by which the Secretary would exercise his authority.

---

[5] See, *e. g.*, *Oneida Indian Nation of New York* v. *County of Oneida*, 414 U. S. 661, 667–670 (1974); *United States ex rel. Hualpai Indians* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 347 (1941). See generally Cohen 510–522.

[6] See *id.*, at 516, and nn. 48–51; *id.*, at 517 (summarizing legislation).

[7] See, *e. g.*, Act of Feb. 28, 1891, § 3, 26 Stat. 795, 25 U. S. C. § 397 (grazing and mining leases); Act of Aug. 15, 1894, § 1, 28 Stat. 305, 25 U. S. C. § 402 (farming leases); Act of Mar. 2, 1899, § 1, 30 Stat. 990, as amended, 25 U. S. C. § 312 (railroad, telephone, and telegraph rights-of-way); Act of Mar. 3, 1901, § 3, 31 Stat. 1083, 25 U. S. C. § 319 (telephone and telegraph rights-of-way); Act of Mar. 11, 1904, §§ 1, 2, 33 Stat. 65, as amended, 25 U. S. C. § 321 (pipelines); Act of Mar. 3, 1909, 35 Stat. 781, as amended, 25 U. S. C. § 320 (reservoirs); Act of June 25, 1910, § 7, 36 Stat. 857, as amended, 25 U. S. C. § 407 (timber sales); Act of June 30, 1919, § 26, 41 Stat. 31, as amended, 25 U. S. C. § 399 (oil and gas leases); Act of May 29, 1924, 43 Stat. 244, 25 U. S. C. § 398 (mining leases).

Congress had extended the Nonintercourse Act to the Territory of New Mexico in 1851,[8] but from shortly after the Civil War until 1910, the territorial courts, sustained by this Court, barred application of the Act to the Pueblos on the grounds that they were not really "Indians." See, *e. g.*, *United States* v. *Joseph,* 94 U. S. 614 (1877); *United States* v. *Lucero,* 1 N. M. 422 (1869). As the Court subsequently conceded, however, this interpretation was erroneous: with respect to "the status of the Pueblo Indians and their lands," the Pueblos always have been "Indians in race, customs, and domestic government" and "like reservation Indians in general." *United States* v. *Sandoval,* 231 U. S. 28, 38–39, 41 (1913). Accordingly, the Court has repeatedly reaffirmed that the Pueblos have the same status as all other federally recognized Indian tribes and that the 1851 Act clearly and fully extended the Nonintercourse Act to them.[9]

In order to reassert its authority over the Pueblos, Congress in the New Mexico Enabling Act of June 20, 1910, provided as a condition for statehood that "all lands . . . owned or held by any Indian or Indian tribes . . . shall be and remain subject to the . . . absolute jurisdiction and control of the Congress of the United States," and that "the terms 'Indian' and 'Indian country' shall include the Pueblo Indians of New Mexico and the lands now owned or occupied by them."[10]

---

[8] Act of Feb. 27, 1851, § 7, 9 Stat. 587: "[A]ll the laws now in force regulating trade and intercourse with the Indian tribes, or such provisions of the same as may be applicable, shall be, and the same are hereby, extended over the Indian tribes in the Territories of New Mexico and Utah."

[9] See, *e. g.*, *United States* v. *Chavez,* 290 U. S. 357, 360–365 (1933); *Pueblo of Santa Rosa* v. *Fall,* 273 U. S. 315, 320–321 (1927); *United States* v. *Candelaria,* 271 U. S. 432, 439–443 (1926).

[10] Act of June 20, 1910, § 2, 36 Stat. 559, 560. See also N. M. Const., Art. XXI, § 2 (adopted Jan. 21, 1911) ("The people inhabiting this state do agree and declare that they forever disclaim all right and title . . . to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through the

After the Enabling Act and the Court's decision in *Sandoval*, the Department of the Interior began to supervise leasing and grants of rights-of-way pursuant to the statutes summarized above. Numerous such conveyances were subjected to its supervision between 1910 and the enactment of the Pueblo Lands Act in 1924,[11] and during its consideration of the 1924 Act Congress was informed that the leasing and right-of-way statutes were being applied to the Pueblos "to the same extent" as other Indian tribes.[12]

The first 16 sections of the Pueblo Lands Act set forth a comprehensive mechanism for resolving the thousands of disputed land claims that resulted from the Pueblos' uncertain status after the Court's decision in *Joseph* and prior to the

---

United States, or any prior sovereignty; and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the congress of the United States").

[11] 1 L. Kelly, Section 17 of the Pueblo Lands Act: A Study of Legislative History and Administrative Practice 7, 21 (unpublished manuscript 1984) (Kelly); 2 *id.*, at 128–135 (Exs. 27–29). See n. 34, *infra*.

[12] Hearings on S. 3865 and S. 4223 before a Subcommittee of the Senate Committee on Public Lands and Surveys, 67th Cong., 4th Sess., 72–73 (1923) (1923 Senate Hearings):

"Senator LENROOT. Has the department ever exercised or attempted to exercise any control over the alienation of property by these Indians?

"Colonel TWITCHELL. Since the enabling act, yes; and since the Sandoval case in particular. The leases that have been made by these Indians which have been made since that time, as I understand it, required the consent of the superintendent.

   •       •       •       •       •

"Senator LENROOT. . . . [M]y point was whether the department was making any disclaimer with reference to protecting their rights, and alienation of property, or things of that sort?

"Commissioner BURKE. Not at all, Mr. Chairman, we are going to the same extent.

"Senator LENROOT. I supposed so."

See also Hearings on H. R. 13452 and H. R. 13674 before the House Committee on Indian Affairs, 67th Cong., 4th Sess., 40–41 (1923).

enactment of the Enabling Act and the decision in *Sandoval*. See *ante*, at 244–246. I believe that § 17—described by its author as "the shortest way to prevent existing conditions from recurring or existing again"[13]—is best read simply as a declaratory reaffirmation of the full applicability to the Pueblos of the Nonintercourse Act as it stood in 1924. Thus, the first clause of § 17—prohibiting the acquisition of Pueblo title under New Mexico law or in "any other manner" except as provided by Congress—served merely to reaffirm the federal pre-emption of all questions concerning Pueblo lands. The second clause of § 17—prohibiting any form of "conveyance . . . unless the same be first approved by the Secretary of the Interior"—can quite similarly be read as merely confirming that conveyances of interests in Pueblo lands must have secretarial approval—*where Congress otherwise has created a mechanism for the Secretary to approve particular conveyances*.

This reading does, of course, render § 17 redundant of then-existing law. But as the Court repeatedly has acknowledged, Congress' historical practice in Indian-law enactments frequently has been to include such general policy declarations and reaffirmations of the status quo. See, *e. g.*, *Bryan* v. *Itasca County*, 426 U. S. 373, 391–392 (1976); *Johnson and Graham's Lessee* v. *McIntosh*, 8 Wheat. 543, 604 (1823). See also *Arizona* v. *San Carlos Apache Tribe*, 463 U. S. 545, 562–563 (1983) (*re* disclaimer clauses in state Enabling Acts). Contrary to the Court's revisionist view, Congress had no doubt whatsoever that questions of Pueblo title *already* had been pre-empted by the Enabling Act,[14] and the first clause of

---

[13] Letter from Francis C. Wilson to Charles H. Burke, at 1 (Dec. 18, 1923), reprinted in 2 Kelly 35 (Ex. 37). See n. 31, *infra*.

[14] The Court believes that Congress intended to "adop[t] a new rule of law" rather than to "apply the Nonintercourse Act to these lands." *Ante*, at 250, 251. See also *ante*, at 244, n. 17 ("The Act itself did not purport to resolve the question whether the Nonintercourse Act applied to the Pueblos"). But Congress *already* had extended the Nonintercourse Act to the

§ 17 can therefore be nothing more than a reaffirmation of federal pre-emption. The second clause of § 17 is part of the same sentence as the first, is linked to the first by the conjunctive "and," and is phrased in the same prohibitory terms—suggesting a similarity of purpose under any reasonable canon of construction.[15] I therefore conclude that § 17, placed in the context of the Nonintercourse Act, the Enabling Act, and the various leasing and right-of-way statutes then in effect, is most comprehensible if viewed simply as reaffirming the status quo represented by those statutes and the *Sandoval* decision. As set forth below, this unambitious construction best accords with the structure of the Pueblo Lands Act and subsequent congressional legislation, with the legislative history, and with the principles that always have guided us in construing legislation pertaining to Indian tribes.[16]

---

Pueblos in both the 1851 Act, see n. 8, *supra*, and in the 1910 Enabling Act, see n. 10, *supra*. During the legislative hearings leading to the Pueblo Lands Act it was agreed that Congress already had pre-empted this matter. See, *e. g.*, 1923 Senate Hearings, at 155. See also S. Rep. No. 492, 68th Cong., 1st Sess., 3 (1924) (question had been "finally determined" by *Sandoval* in 1913). Until today, the Court has consistently acknowledged this effect of the 1851 and 1910 Acts. See cases cited in n. 9, *supra*.

[15] See 2A C. Sands, Sutherland on Statutory Construction § 47.16 (4th ed. 1984). See also *infra*, at 277, and n. 65.

[16] As with every other reading of § 17, some anomalies remain under this interpretation. I agree with the Court that the second "hereafter" in the first clause of § 17 could not have been intended to have operative significance. *Ante*, at 253, n. 27. Moreover, the reference to any "conveyance . . . made by . . . any Pueblo Indian living in a community of Pueblo Indians" could not possibly have been meant to have immediate literal effect. Pueblo lands were unallotted and therefore held in fee simple communal title, so an individual Pueblo Indian could not have had the power to convey land. Perhaps Congress intended by this language to encompass the possibility that Pueblo lands might in the future be allotted to individual members. The federal allotment policy came to an end with the enactment of the Indian Reorganization Act of 1934, 48 Stat. 984, as amended, 25 U. S. C. § 461 *et seq*. See generally Cohen 147–149.

## II

The Court concludes, however, that Congress intended by the second clause of § 17 to reject application of the Nonintercourse Act "to these lands" and instead to adopt "a new rule of law" authorizing a Pueblo to "convey good title to its lands with the approval of the Secretary of the Interior." *Ante*, at 251, 250, 247.

### A. *Statutory Structure*

The Court believes this interpretation "better harmonizes the two clauses of § 17 with the structure of the entire Act." *Ante*, at 252. The Court's interpretation, however, would render wholly superfluous § 16 of the Act, which gave explicit congressional authorization to conveyances of Pueblo lands in one extremely narrow set of circumstances. Specifically, § 16 authorized the sale of land found by the Pueblo Lands Board to belong rightfully to a Pueblo *if* (1) the land "be situate among lands adjudicated or otherwise determined in favor of non-Indian claimants and apart from the main body of the Indian land"; (2) the Pueblo and the Secretary concurred in the sale; and (3) the land went to "the highest bidder for cash." [17] The purpose of this provision was to "get

---

[17] Section 16, 43 Stat. 641, provided in full:

"That if any land adjudged by the court or said lands board against any claimant be situate among lands adjudicated or otherwise determined in favor of non-Indian claimants and apart from the main body of the Indian land, and the Secretary of the Interior deems it to be for the best interest of the Indians that such parcels so adjudged against the non-Indian claimant be sold, he may, with the consent of the governing authorities of the pueblo, order the sale thereof, under such regulations as he may make, to the highest bidder for cash, and if the buyer thereof be other than the losing claimant, the purchase price shall be used in paying to such losing claimant the adjudicated value of the improvements aforesaid, if found under the provisions of section 15 hereof, and the balance thereof, if any, shall be paid over to the proper officer, or officers, of the Indian community, but if the buyer be the losing claimant, and the value of his improvements has been adjudicated as aforesaid, such buyer shall be entitled to have credit upon his bid for the value of such improvements so adjudicated."

the Indian holdings contiguous to one another." 1923 Senate Hearings, at 154 (Sen. Jones of New Mexico).

The Court argues vaguely that § 16 was "probably considered" an "isolated element" of the Act, and that it somehow uniquely enabled the Secretary to "take the initiative" in "urging" consolidation of Pueblo lands. *Ante*, at 253, n. 26. This unsupported argument is untenable. As the Solicitor for the Department of the Interior emphasized just last year, "[i]t is inconceivable that Congress would have authorized the sale of Pueblo lands under the very narrow circumstances of Section 16, and then one section later would have empowered the Pueblos to alienate their lands for any purpose and with no standards or conditions other than Secretarial approval. Such an irrational result could not have been intended by Congress." [18]

The error of the Court's interpretation is further exposed by the fact that, since 1924, Congress recurrently has enacted legislation affirmatively authorizing much narrower conveyances of interests in Pueblo lands—legislation that would have had no rational basis if, as the Court concludes, Congress *already* had authorized unlimited conveyances of Pueblo lands simply upon secretarial approval. For example: (1) In 1928, in response to concern that the existing easement and right-of-way statutes *might* not technically be applicable to Pueblo lands, Congress enacted legislation clarifying that nine of those statutes, along with "the basic Acts of Congress cited in such sections," were fully "applicable to the Pueblo Indians of New Mexico and their lands." [19]

---

[18] Solicitor Frank K. Richardson to Assistant Attorney General F. Henry Habicht II, p. 5 (Oct. 31, 1984) (Richardson Memorandum).

[19] Act of Apr. 21, 1928, 45 Stat. 442, as amended, 25 U. S. C. § 322. Although the Department had consistently applied the general easement and right-of-way statutes to the Pueblos, a new Special Assistant to the Attorney General concluded in 1926 that, as a result of the peculiar wording of the Act of Mar. 2, 1899, pertaining to railroad rights-of-way, "[i]t is not quite certain that it does not include them, but it looks as though it did

These provisions included numerous procedural and financial safeguards governing such conveyances. (2) Congress in 1933 extended the narrow provisions of § 16 to authorize the sale by the Pueblos and the Secretary of *any* land that had been taken from a non-Indian claimant by the Pueblo Lands Board.[20] Congress' purpose was to remove the "restrictions in the sale of [these] lands";[21] the legislation was designed to authorize alienation of Pueblo lands only in "*a limited number of situations*" where necessary to consolidate a tribe's land base.[22] (3) In 1948, Congress authorized the Secretary to grant rights-of-way "for all purposes" across "the lands belonging to the Pueblo Indians in New Mexico," subject to "the consent of the proper tribal officials" of organized tribes.[23] (4) In 1949, Congress authorized the Pueblos and the Secretary to exchange certain Pueblo lands for those in

---

not." See *infra*, at 271, and n. 39. On the premise that the 1899 Act was "probably not sufficiently broad to cover the matter," H. R. Rep. No. 955, 69th Cong., 1st Sess., 2 (1926), Congress enacted emergency legislation authorizing condemnation proceedings in federal district court against Pueblo lands. The Act was invalidated as a result of procedural defects, see H. R. Rep. No. 816, 70th Cong., 1st Sess., 1 (1928), and Congress subsequently enacted the 1928 Act to clarify that the general easement and right-of-way provisions were "applicable to the Pueblo Indians of New Mexico," *ibid.*

[20] Act of May 31, 1933, § 7, 48 Stat. 111.

[21] S. Rep. No. 73, 73d Cong., 1st Sess., 4 (1933).

[22] *Id.*, at 17 (emphasis added). Specifically, these situations were those "wherein non-Indian settlements of long standing, recovered for the Pueblos, are not needed by the Pueblos but may more profitably be sold and the proceeds reapplied to the purchase or improvement of lands nearer to the ancient Pueblo villages." *Ibid.* See also H. R. Rep. No. 123, 73d Cong., 1st Sess., 4 (1933) (legislation was designed to permit "the blocking of lands belonging to the tribes").

[23] Act of Feb. 5, 1948, §§ 1, 2, 62 Stat. 17–18, 25 U. S. C. §§ 323, 324. Five of the nineteen Pueblo Tribes organized under the Indian Reorganization Act of 1934, see n. 16, *supra*. H. R. Conf. Rep. No. 94–1439, p. 4 (1976). The Department has long extended this consent requirement to rights-of-way over all Pueblo lands. See 25 CFR §§ 162.2–162.5 (1985).

the public domain "[f]or the purpose of consolidation" of tribal lands.[24]   (5) Similar legislation was enacted in 1961 "[f]or the purpose of improving the land tenure pattern and consolidating Pueblo Indian lands."[25]   (6) In 1968, Congress authorized the Cochiti, Pojoaque, Tesuque, and Zuni Pueblos to lease their lands for specified purposes "for a term of not to exceed ninety-nine years," except for grazing leases which could not exceed 10 years.[26]   This authorization created an exception for these Tribes from the statutory provisions applicable to the other Pueblo Tribes, which limit Indian leasing of restricted lands to 25 years.[27]   (7) Congress in 1976 enacted legislation to clarify the full applicability of the general right-of-way provisions to the Pueblos;[28] the purpose was "to place the New Mexico Pueblo Indians in the same position relative to grants of rights-of-way across their lands as other federally recognized Indian tribes."[29]

Each of these enactments would have been meaningless if § 17 already authorized Pueblo leases of unlimited duration and even outright sales of land.   The enactments of 1924, 1933, 1947, and 1961 clearly demonstrate that Congress has authorized alienation of Pueblo lands *only* where necessary to consolidate the tribal base and to improve land tenure patterns—a carefully crafted effort that the Court's interpretation today annuls.   Similarly, the enactments of 1928, 1948, 1968, and 1976 demonstrate Congress' intent that leases and rights-of-way on Pueblo lands be subject to the same procedural and financial safeguards that govern such conveyances on Indian lands generally—an intent that is irreconcilable with the notion that § 17 created an entirely independent avenue for alienation of Pueblo title subject only to standardless secretarial approval.

---

[24] Act of Aug. 13, 1949, § 2, 63 Stat. 605, 25 U. S. C. § 622.

[25] Pub. L. 87–231, § 10, 75 Stat. 505, 25 U. S. C. § 624.

[26] Pub. L. 90–570, 82 Stat. 1003, as amended, 25 U. S. C. § 415.

[27] *Ibid.*

[28] Pub. L. 94–416, § 3, 90 Stat. 1275, 25 U. S. C. § 322.

[29] H. R. Conf. Rep. No. 94–1439, at 4.

## B. *Legislative History*

The Court explains, however, that its baffling interpretation of § 17 is "consistent with the limited legislative history available." *Ante*, at 253. All the Court can offer in support of this assertion is a carefully distilled excerpt from a colloquy between Senator Lenroot and Francis Wilson, an attorney for the Pueblos, during a 1923 Senate hearing. *Ante*, at 253–254, n. 28. Senator Lenroot inquired "whether it might not [be] advisable to provide that these lands may be sold or alienated with the consent of both the Pueblo and the Secretary of the Interior," and Wilson replied that it would be "quite desirable under some conditions." 1923 Senate Hearings, at 155.

Unfortunately, the Court omits some rather crucial language demonstrating that the *entire* colloquy it relies upon pertained to § 16 rather than to § 17. Senator Lenroot began by asking: "Might there be cases where it would be to the interest of the Indians to sell?" *Id.*, at 154. Wilson responded that "I can not think of one. There might be, but I have not any in mind." *Ibid.* Senator Jones of New Mexico then suggested that "where there are allotments, strips here and there, where the title has been divested from the Indian, might it not be advisable as to the strips where non-Indians have not the title, interspersed with strips where non-Indians have the title, that there be some disposition of that land so as to get the Indian holdings contiguous to one another." *Ibid.* Everyone present agreed that "[i]t would be very desirable." *Ibid.* (Wilson).

The participants turned next to the question whether the Secretary could authorize such conveyances. As was "true generally of the Indian law," it was agreed that the Secretary could not have "anything to do with it" because "Congress has taken full jurisdiction of the sale of this land," and would therefore "[a]bsolutely" have "to legislate upon it." *Id.*, at 155 (Sen. Lenroot, Comm'r Burke, Mr. Renehan, Sen. Jones). It was only at this point that Senator Lenroot queried whether Congress should provide that "*these* lands may

be sold or alienated," and Wilson agreed that it would be "quite desirable under some conditions." *Ibid.* Wilson then identified what the "some conditions" were—where the Pueblos "could make swaps and transfers [so] they could get their lands into much better condition." *Ibid.*

This "limited" legislative history, *ante*, at 253, therefore demonstrates that (1) all participants understood that Congress would have to give its approval to any alienation of Pueblo lands, and (2) Congress intended to do so only where necessary "to get the Indian holdings contiguous to one another"—the precise function of the narrowly drafted § 16. Nowhere was it suggested that Congress, after hammering out this limited authorization for alienation of *some* Pueblo lands, would then intend to authorize alienation of *all* Pueblo lands.[30]

Section 17 was drafted by Francis Wilson, an attorney representing the *Pueblos* in the legislative proceedings,[31] and the Court has not suggested how a provision drafted by Indian advocates who were urging simply that the Pueblos be treated like other tribes could possibly have been intended to override the restraints against alienation set forth in the

---

[30] The Court apparently believes that a comparison of the Pueblos to the "Five Civilized Tribes" during the colloquy discussed above supports its conclusion that Congress intended to authorize outright alienation of Pueblo lands subject only to secretarial approval. See *ante*, at 253–254, n. 28. But the tribal lands of the Five Tribes, most of which were allotted around the turn of the century, were made inalienable for specified periods of time, restrictions that have been extended on allotments of tribal members of half or more Indian blood subject to detailed congressional standards for relaxing the restrictions. See generally Cohen 785–788. Contrary to the Court's implication, there is no parallel between management of the Five Tribes' property and management of Pueblo property under the Court's interpretation of § 17.

[31] See, *e. g.*, Letter from Francis Wilson to Roberts Walker, at 3 (Nov. 5, 1923), reprinted in 2 Kelly 3 (Ex. 1); Letter from Francis C. Wilson to Charles H. Burke, at 2 (Nov. 26, 1923), reprinted in 2 Kelly 7 (Ex. 2). See generally 1 Kelly 10–11.

Nonintercourse Act. That § 17 was simply intended as a declaratory reaffirmation of the full scope of the Nonintercourse Act is best illustrated by the fact that it provoked *no* debate, commentary, or opposition. The much more modest § 16, on the other hand, engendered sharp controversy.[32] As one historian concluded after reviewing all available legislative history, departmental records, and private correspondence, there is

> "nothing in the record to indicate that Wilson or anyone else intended or interpreted Section 17 as authorizing the Pueblos to convey their lands to any greater extent than other Indians, or otherwise modifying the Non-Intercourse Act in any substantive way. Such a construction, if circulated at that time, would certainly have provoked heated debate and opposition from the Collier group and others,[33] especially since sales by individuals and tribal officials had in part caused the turmoil that led to the Act. What is remarkable about Section 17 is that it was so easily accepted, apparently by consensus. Almost alone among the lengthy provisions of the various bills, it was undisputed and unamended."[34]

After a similar review, the Solicitor for the Department of the Interior found only last year that "[n]owhere in the legislative history is there any suggestion that Section 17 was

---

[32] See, *e. g.*, 1923 Senate Hearings, at 105–106, 154–155.

[33] The reference is to John Collier, who became Commissioner of Indian Affairs in 1933. Collier and organizations that he represented were opposed to further alienation of the Indian tribal base, and they played an active role in the enactment of the Pueblo Lands Act. 1 Kelly 5–20. Many of Collier's views against further alienation became law upon enactment of the Indian Reorganization Act of 1934, see n. 16, *supra*. See generally Cohen 144–149.

[34] 1 Kelly 14. This report was prepared under contract with the Bureau of Indian Affairs of the Department of the Interior, and is based on, *inter alia*, administrative records stored at the National Archives and the New Mexico State Archives.

intended to grant the Pueblos and the Secretary the power to alienate Pueblo lands." [35]   The Court has offered nothing plausibly suggesting the contrary.

## C. *Administrative Construction*

The Court explains, however, that the "uniform contemporaneous view" of executive officials commands "'very great respect.'" *Ante,* at 254.   Even if this were an appropriate case to defer to a consistent administrative construction,[36] the checkered history of the Department of the Interior's construction of § 17 demonstrates that the Court's purported deference is wholly unwarranted.   "We have recognized previously that the weight of an administrative interpretation will depend, among other things, upon 'its consistency with earlier and later pronouncements' of an agency." *Morton* v. *Ruiz,* 415 U. S. 199, 237 (1974), quoting *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944).   See also *FEC* v. *Democratic Senatorial Campaign Committee,* 454 U. S. 27, 38–39 (1981); *United States* v. *National Assn. of Securities Dealers, Inc.,* 422 U. S. 694, 718–719 (1975).   The record demonstrates that the Department's construction of § 17 has swung wildly back and forth over the past 60 years.

For the first two years after the Pueblo Lands Act was enacted, the Secretary routinely applied the general right-of-way statutes to the Pueblo, as he had prior to the Act.[37] Among the numerous rights-of-way granted pursuant to these restrictive provisions were 50-year easements to the petitioner Mountain States Telephone and Telegraph Com-

---

[35] Richardson Memorandum, at 4.

[36] In light of the canons of construction requiring (1) a "plain and unambiguous" expression of congressional intent to lift restraints on alienation, see *infra,* at 275–279, and (2) that all ambiguities in legislation be resolved in favor of preserving Indian rights and title, see n. 66, *infra,* this is not an appropriate case for invoking the usual rules of deference to administrative actions.   See generally *Morton* v. *Ruiz,* 415 U. S. 199, 236–237 (1974); Cohen 225–228.

[37] 1 Kelly 14–17, 20–21; see also 2 *id.,* at 149–150 (Ex. 35).

pany.[38]   Never was there even a hint that § 17 might have worked any change in the law or in the narrow exceptions to Congress' policy against alienation.

In 1926, however, a new Special Assistant to the Attorney General, George A. H. Fraser, concluded that the existing right-of-way statutes *probably* did not cover the Pueblos: "It is not quite certain that [the statutes do] not include them, but it looks as though [they] did not."[39]   Moreover, Fraser concluded that the first clause of § 17—prohibiting any alienation "except as may *hereafter* be provided by Congress"—meant literally that no transfer of any interest in Pueblo land could occur until Congress acted at some undetermined point in the future.[40]   Fraser accordingly began filing trespass suits pursuant to the Pueblo Lands Act against railroad companies and utilities that had rights-of-way across Pueblo lands.[41]

These companies, obviously, were not anxious to submit to extended litigation.   A representative of one of them stated that it was essential to find a method to get easements and rights-of-way "railroaded thru" the federal bureaucracy with a minimum of delay.[42]   The record clearly shows that the construction of § 17 to permit Pueblo alienation was developed, not by a Government official, but by an attorney for a Chicago bond house underwriting one of the railroads.[43]

---

[38] 1 *id.*, at 21; see also 2 *id.*, at 133–135 (Ex. 29) (Secretary's approval).

[39] Letter from George A. H. Fraser to J. M. Baca, at 1 (Apr. 1, 1926), reprinted in 2 Kelly 211 (Ex. 59).

[40] Letter from George A. H. Fraser to Attorney General, at 4 (Nov. 4, 1925), reprinted in 2 Kelly 151 (Ex. 35).   See also Letter from George A. H. Fraser to E. W. Dobson, at 4 (Feb. 24, 1926), reprinted in 2 Kelly 161 (Ex. 38).

[41] Letter from George A. H. Fraser to Attorney General, at 5 (Nov. 4, 1925), reprinted in 2 Kelly 152 (Ex. 35); see also 1 *id.*, at 23; 2 *id.*, at 155–161 (Exs. 36–38).

[42] Quoted in 1 *id.*, at 29; see also 2 *id.*, at 214 (Ex. 60).

[43] Letter from George A. H. Fraser to Attorney General, at 3 (Feb. 27, 1926), reprinted in 2 Kelly 164 (Ex. 39); see also Letter from H. J. Hagerman to Charles H. Burke (Mar. 1, 1926), reprinted in 2 Kelly 174

Attorneys with the Office of Indian Affairs believed this new interpretation was "doubtful" and "inconsistent" with the underlying premises of the Pueblo Lands Act.[44] Fraser himself thought it was inconsistent to authorize the Pueblos "to convey, even subject to an approval, which must usually be based on the recommendation of some local official who may or may not be fully informed and disinterested."[45] Nevertheless, Fraser recommended and obtained the Secretary's approval of this approach on the theory that "the general good would be served by acquiescing rather than by urging the doubts suggested by Sec. 17."[46] Agency officials, however, continued to believe the interpretation was "doubtful."[47]

From 1926 until 1933, 55 rights-of-way were obtained by this method.[48] Many of the grantees would otherwise have been forced to defend quiet title suits under the Pueblo Lands Act. By acquiring deeds directly from the Pueblos, they were able either to avoid litigation or to be dismissed out as defendants, as was the petitioner in this case.[49] Fraser described this method as "the cheapest and easiest way of getting rid of" controversies involving Pueblo lands.[50]

---

(Ex. 42); Letter from Walter C. Cochrane to H. J. Hagerman, at 2 (May 24, 1926), reprinted in 2 Kelly 191 (Ex. 50).

[44] Letter from Walter Cochrane to Charles H. Burke, at 2, 4 (Mar. 1, 1926), reprinted in 2 Kelly 171, 173 (Ex. 41). See also id., at 4: "If the Pueblo Indians are wards of the Government, as they have been decided to be by the court of last resort, it would seem inconsistent with such a theory to hold they have, in any instance, the power to convey their lands."

[45] Letter from George A. H. Fraser to Attorney General, at 4 (Feb. 27, 1926), reprinted in 2 Kelly 165 (Ex. 39).

[46] Ibid.

[47] Letter from Walter C. Cochrane to Charles H. Burke, at 1 (Apr. 20, 1926), reprinted in 2 Kelly 234 (Ex. 69).

[48] 1 id., at 38.

[49] See App. 37 (order of dismissal). See also 1 Kelly 36.

[50] Letter from George A. H. Fraser to Joseph Gill, at 1 (May 10, 1928), reprinted in 2 Kelly 344 (Ex. 113).

There usually was "no difficulty . . . at all" in persuading the Pueblos to sign such deeds;[51] a "carload of lumber" was sometimes thrown in to sweeten the deal.[52] As the Solicitor for the Department of the Interior recently observed, this construction of § 17 frequently resulted in the outright avoidance of clearly applicable statutes that would have provided far greater procedural and financial protection to the Pueblos than a process that involved the "mere approval of an existing agreement negotiated by a tribe."[53] Cf. *United States* v. *Locke*, 471 U. S. 84, 124, n. 12 (1985) (STEVENS, J., dissenting) (criticizing the Department of the Interior's use of "every technical construction" of an ambiguous statute to enable the "suck[ing] up" of property "much as a vacuum cleaner, if not watched closely, will suck up jewelry or loose money").

Section 17 was used only sporadically from the 1920's to the 1950's. From 1926 to 1933 there were 55 approvals pursuant to its terms; from 1936 to 1944 there were 13; from 1953 to 1959 there were 11.[54] Section 17 has never been used since 1959 to authorize any Pueblo conveyance.[55] On the other hand, since the 1920's at least 779 rights-of-way over Pueblo lands have been obtained pursuant to the generally applicable right-of-way statutes and in accordance with the strict safeguards contained therein.[56] In the 1940's, the Solicitor for

---

[51] Letter from R. H. Hanna to George A. H. Fraser (Mar. 25, 1926), reprinted in 2 Kelly 186 (Ex. 48). The deeds frequently were not actually signed; as the Pueblo of Santa Ana notes with respect to the right-of-way at issue in this case, "none of the Pueblo's officers could even sign his name" and "the original of the easement shows that they thumbprinted it." Brief for Respondent 11, n. 12.

[52] Letter from R. H. Hanna to George A. H. Fraser (Mar. 25, 1926), reprinted in 2 Kelly 186 (Ex. 48). See also 1 *id.*, at 26–27.

[53] Richardson Memorandum, at 5.

[54] 1 Kelly 38.

[55] *Ibid.*

[56] *Ibid.;* see also Richardson Memorandum, at 6: "In the instant case, the Department's reliance on Section 17 falls far short of being consistent. Approximately 75 rights-of-way were approved pursuant to Section 17,

the Department of the Interior concluded that § 17 did *not* authorize the acquisition of rights-of-way and that any such acquisitions must be made pursuant to the general statutes.[57] Nevertheless, § 17 occasionally was invoked thereafter where a "small amount of acreage [was] involved" and in order to avoid "considerable work for . . . the agency."[58] Consistent with the views of the Department in recent generations, the Department's Solicitor concluded last year that "Congress did not intend Section 17 to be construed as authorizing the alienation of Pueblo lands," that the contrary view was "irrational," and that the courts in this case had been correct to "disregard the Department's [earlier] interpretation of that section."[59] And as the Government has emphasized before this Court, the earlier administrative construction—such as it was—applied only to rights-of-way except for one or two isolated incidents, and therefore cannot reasonably support an interpretation of § 17 that would generally authorize outright alienation of Pueblo lands.[60]

---

primarily during the period 1928 to 1934. However, a far greater number *of rights-of-way were approved pursuant to the 1928 and 1948 Acts."*

[57] "The Solicitor in his memorandum of February 25, 1943, held that while grants of rights of way had been made by the Pueblos and approved by the Secretary of the Interior pursuant to Section 17 . . . the Act of April 21, 1928 . . . made applicable to the Pueblos certain acts dealing with rights of way and that these Acts and regulations promulgated thereunder now govern the procedure in the acquisition of such rights of way." Memorandum from W. D. Weekley to Secretary of the Interior (Aug. 14, 1943), reprinted in 2 Kelly 298 (Ex. 98).

[58] Memorandum from William Zimmerman, Jr., to Secretary of the Interior (May 31, 1946), reprinted in 2 Kelly 300 (Ex. 100).

[59] Richardson Memorandum, at 5–6.

[60] Brief for United States as *Amicus Curiae* 27. The record shows, however, that on one occasion in 1928 § 17 was used to validate the sale of 435 acres of Pueblo lands to the townspeople of Bernalillo, N. M. "This acreage was claimed by dozens of claimants in small parcels," 1 Kelly 42, and was interspersed in the town with lands held by non-Indians—the precise situation envisioned by Congress in § 16. Nevertheless, the sale was validated under § 17. The land was acquired from the Pueblos for "slightly

The Court's notion of deference to agency expertise in an Indian case, then, appears to go something like this: where a proffered construction of a statute was not followed for two years but was then advocated by private attorneys and "acquiesce[d]" in by the Government as a matter of convenience; where that construction was then used to avoid the fiduciary safeguards of other legislation but withered away after a decade or two; where the construction was followed in less than 10% of the cases to which it could have been applied; where the construction was rejected by the agency more than 40 years ago and branded "irrational" by the agency's top legal officer just last year; and where the Government has urged that the construction be given a narrow compass at most, this Court as a matter of deference to such a "uniform" construction will adopt the most extreme version of that construction as the law of the land.[61]

## D. *Canons of Construction*

Finally, even if the Court's interpretation of § 17 had some plausible basis in the structure of the Pueblo Lands Act or its

---

over $6.00 an acre," although the Pueblo Lands Board's "own appraisals valued most of it at several hundred dollars an acre." *Id.*, at 44.

[61] The Court's "deference" to Fraser's 1926 interpretation of § 17's *second* clause, *ante*, at 254, n. 29, is unconvincing for an additional reason. At various times Fraser interpreted § 17's *first* clause as either (1) literally prohibiting *any* acquisition of interests in Pueblo lands unless Congress "hereafter" authorized such acquisitions, or (2) prohibiting *involuntary* transfers of such interests without prior congressional approval. See, *e. g.*, Letter from George A. H. Fraser to Attorney General, at 4 (Nov. 4, 1925), reprinted in 2 Kelly 151 (Ex. 35); Letter from George A. H. Fraser to Attorney General, at 3 (Feb. 27, 1926), reprinted in 2 Kelly 164 (Ex. 39). See also App. to Brief for Petitioner 3a–4a. Today the Court rejects both of these interpretations *sub silentio*, adopting instead a novel interpretation of the first clause of § 17 that *no one* has ever followed. *Ante*, at 252–253. The Court's principle of deference to a prior administrative construction therefore appears to be that such deference is appropriate only to the extent that the prior construction accords with the Court's desired interpretation.

legislative history, the canons of construction that this Court ' has followed since early in the 19th century nevertheless should compel its rejection given that other interpretations of § 17 more faithfully hew to the terms of the Nonintercourse Act.  The Constitution grants Congress—not this Court— the power to set national policy respecting Indian lands,[62] and since the 19th century the cornerstone of Congress' policy has been to impose strict restraints on alienation of Indian title—a policy grounded on the federal trust responsibility toward Indian tribes.[63]  In accordance with general fiduciary principles, departures from this policy against alienation are not to be "lightly implied."  *United States ex rel. Hualpai Indians* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 354 (1941).  Ambiguous language in Indian statutes therefore always has been construed in favor of restrictions on alienation.  See, *e. g.*, *Northern Cheyenne Tribe* v. *Hollowbreast*, 425 U. S. 649, 656 (1976); *Starr* v. *Long Jim*, 227 U. S. 613, 622–623 (1913).  Congressional intent to authorize the extinguishment of Indian title must be "plain and unambiguous," *United States ex rel. Hualpai Indians* v. *Santa Fe Pacific R. Co.*, *supra*, at 346—that is, it either "must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history," *Mattz* v. *Arnett*, 412 U. S. 481, 505 (1973) (termination of reservation).[64]  Just this

---

[62] U. S. Const., Art. I, § 8, cl. 3: "The Congress shall have Power . . . To regulate Commerce . . . with the Indian Tribes . . . ."  The authority to control tribal property is "one of the most fundamental expressions, if not the major expression, of the constitutional power of Congress over Indian affairs."  *Delaware Tribal Business Committee* v. *Weeks*, 430 U. S. 73, 86 (1977).

[63] See, *e. g.*, *County of Oneida* v. *Oneida Indian Nation of New York*, 470 U. S. 226, 247–248 (1985); *Oneida Indian Nation of New York* v. *County of Oneida*, 414 U. S., at 667–670; *United States* v. *Creek Nation*, 295 U. S. 103, 109–111 (1935); *Cherokee Nation* v. *Georgia*, 5 Pet., at 17; *Johnson and Graham's Lessee* v. *McIntosh*, 8 Wheat. 543, 591, 604 (1823). See generally Cohen 220–228, 508–528.

[64] See also *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 676 (1979); *Bryan* v. *Itasca County*,

Term, we followed these principles in concluding that various congressional enactments had neither authorized nor ratified sales of land by the Oneida Indian Nation of New York; the congressional language, we found, "far from demonstrates a plain and unambiguous intent to extinguish Indian title." *County of Oneida* v. *Oneida Indian Nation of New York*, 470 U. S. 226, 248 (1985). Cf. *Montana* v. *Blackfeet Tribe of Indians*, 471 U. S. 759, 765–766 (1985) (state taxation of Indian lands).

Section 17's "puzz[ling]" language, *ante*, at 253, n. 27, can hardly be characterized as a "plain and unambiguous" statement of congressional intent to enable the Pueblos, unlike any other Indian tribe holding unallotted lands, to alienate their property. The language itself is phrased entirely in the negative ("*No* right, title or interest shall . . . be acquired . . . *and no* sale, grant, lease . . . . shall be of any validity" (emphasis added)), and is more plausibly read as simply declaratory of restraints already in effect. See *supra*, at 261–262. When Congress intends affirmatively to authorize Indian tribes or the Secretary to convey interests in Indian lands, it consistently has done so in clear, express language (*e. g.*, "[t]he Secretary . . . is authorized to grant permission"; "restricted Indian lands . . . may be leased by the Indian owners").[65] Congress therefore was "fully aware of the means" by which alienation could have been authorized, *Mattz* v. *Arnett, supra*, at 504, and not to employ those means in §17. Moreover, if §17 was intended to have the broad operative significance that the Court unearths, it is curious why Congress never

---

426 U. S. 373, 392 (1976); *Menominee Tribe* v. *United States*, 391 U. S. 404, 412–413 (1968); *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918).

[65] See, *e. g.*, 25 U. S. C. §§ 311–312, 319–321, 322a, 323, 350, 352, 352a, 352b, 373, 373a, 373b, 378–380, 391a, 392–393, 393a, 394–396, 396a, 396e, 396g, 397–398, 398a, 398e, 399–400, 400a, 401–402, 402a, 403, 403a, 403a–1, 403a–2, 403b, 404–409, 409a, 415, 415a, 416, 416c, 463e, 464, 483, 483a, 487, 564c, 564g, 564w–1(b), (e), 564w–2, 574, 593, 608, 610, 610a, 610c, 622, 635, 677h, 677o, 721, 745–746, 953, 958, 973–974.

has seen fit to have it codified in Title 25 of the United States Code. For these reasons, and because the Court's contrary interpretation so clearly flouts the structure of the Pueblo Lands Act, the legislative history, and the significance of subsequent legislation, I must conclude that § 17 can only be read as having attempted to set forth a broad declaratory reaffirmation of the Nonintercourse Act as Congress believed that Act applied to the Pueblos.[66]

It might be argued, however, that the Court's construction treats the Pueblos with a greater degree of respect by giving them broader automony in disposing of tribal lands, and that a contrary reading simply reflects a view that the Pueblos are somehow incapable of managing their own affairs. There is no question that the federal policy against alienation at one time embodied paternalistic notions of "protecting Indians from their own improvidence."[67] But the federal policy now rests on much different grounds. Congress' policy reflects its determination that restraints on alienation are necessary to "insulate Indian lands from the full impact of market forces" and thereby to preserve "a substantial tribal land base [that is] essential to the existence of tribal society and

---

[66] The Court's interpretation stands in violation of other canons of construction as well. Under the interpretation I suggest, Pueblo conveyancing is subject to the full range of procedural and financial safeguards set forth in the statutes governing such conveyances by Indian tribes generally. Under the Court's interpretation, Pueblo conveyancing is not. Yet it is well established that, when faced with two such conflicting interpretations, courts must resolve ambiguities in favor of preserving Indian rights and safeguards—a course dictated by "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Seminole Nation* v. *United States*, 316 U. S. 286, 296 (1942). See *United States* v. *Mitchell*, 463 U. S., at 225; *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 174 (1973); *Choctaw Nation of Indians* v. *United States*, 318 U. S. 423, 431–432 (1943); *Carpenter* v. *Shaw*, 280 U. S. 363, 367 (1930). See generally Cohen 221–225.

[67] *Id.,* at 509.

culture."[68]    As the respondent Pueblo of Santa Ana has argued:

> "There is no inconsistency in the Pueblos wanting to insure the applicability to their lands of the full array of federal restrictions on alienation.  Like other tribes, the Pueblos as communities take the long view in wanting to preserve their homelands.  Bitter experience prior to the Pueblo Lands Act, and even more recently . . . has shown that tribal councils can be induced to agree to unwise conveyances.  A single such transaction could cause the total loss of the land base, and the ultimate disappearance of the tribal entity.  Reposing an unconditioned, delegable power of approval in the Secretary, moreover, may not provide adequate protection against improvident transactions. . . . Characteristically, it is non-Indian entities such as Petitioner and *amici* who argue for 'emancipation' of the Pueblos."[69]

The federal policy against alienation, and this Court's long-standing canons of construction deferring to that policy, may or may not ultimately be sound.  But that is a question for Congress, and it is not for this Court to indulge in unsupportable statutory analysis simply to further its own views on the proper management of Indian affairs.[70]

---

[68] *Ibid.*  "The continued enforcement of federal restrictions, in this view, derives not from a perceived incompetence of the 'ward,' but from a perceived value in the desirability of a separate Indian culture and polity." *Id.*, at 510.    See also S. Rep. No. 93–604 (1973) (*re* Menominee Tribe).

[69] Brief for Respondent 29, n. 25.    See also Chambers & Price, Regulating Sovereignty: Secretarial Discretion and the Leasing of Indian Lands, 26 Stan. L. Rev. 1061 (1974).

[70] The Court repeatedly tries to justify its decision by reference to the so-called "unique status" and "unique and 'interesting history of the Pueblo Indians.'"    *Ante*, at 240, 242; see also *ante*, at 251.    Yet Congress' consistent judgment—to which some deference is due—has since 1851 been that the Pueblo Tribes should be in "the same position . . . as other federally recognized Indian tribes."    H. R. Conf. Rep. 94–1439, at 4.    Simi-

## III

As it came to us on petition for a writ of certiorari, this case involved an obscure statute that related only to the 19 Pueblo Tribes in New Mexico. With but one or two exceptions, it never had been used to sanction outright alienation of tribal lands, see n. 60, *supra*, and it had been used to convey lesser interests approximately 80 times in its 60-year history. Moreover, the statute had fallen into virtually complete disuse and oblivion for the last two generations. We also were advised that the question presented—however important to the individual Tribes and companies involved—nevertheless implicated little more than a handful of easements.[71] And, we were advised, most of those easements already had been renegotiated (under the general provisions, not §17).[72]

In addition, the District Court for the District of New Mexico and the Court of Appeals for the Tenth Circuit had both concluded that petitioner's proffered construction of §17 did not accord with the well-settled status of the Pueblo Tribes.[73] Those courts, by virtue of their geographic position, have essentially exercised exclusive jurisdiction over federal questions pertaining to the Pueblos since New Mexico statehood. As a result of their continuing exposure to cases involving the Pueblos, these courts have been in the best position to understand "the unique and 'interesting history of the Pueblo Indians,'" *ante*, at 240, and to evaluate at close

---

larly, with the exception of the *Joseph* decision this Court consistently has held that notwithstanding any differences in history or lifestyle the Pueblos have the *identical* status as other Indian tribes under the Nonintercourse Act. See, *e. g.*, *United States* v. *Chavez*, 290 U. S., at 361–365; *Pueblo of Santa Rosa* v. *Fall*, 273 U. S., at 320–321; *United States* v. *Candelaria*, 271 U. S., at 439–443; *United States* v. *Sandoval*, 231 U. S. 28, 45–48 (1913).

[71] Brief in Opposition 6, 24–25.

[72] *Id.*, at 24–25; see also Brief for Respondent 2–3; Tr. of Oral Arg. 32–33.

[73] See App. 86–92; 734 F. 2d 1402, 1404–1407 (1984).

range the relationship between the Pueblo Tribes and the Federal Government. With the exception of several procedural dismissals of quiet title actions in the 1920's,[74] these courts over the last 60 years have consistently held that Pueblo lands are *fully* governed by the Nonintercourse Act and that such lands are inalienable without explicit congressional authorization.[75] They also have consistently held that

[74] The Court argues that the District Court in the 1920's "placed a stamp of approval on this transaction and numerous others," and that these actions are "'entitled to very great respect.'" *Ante*, at 254. However, with apparently only two exceptions, the District Court's "approval[s]" consisted simply of granting motions by the Government (acting as guardian for the Pueblos) to dismiss certain quiet title actions *before* the defendants had even answered the complaints. These dismissals were not on the merits and the validity of § 17 conveyancing had not been contested, and they therefore cannot be relied upon as authority for the Court's decision. See *Oklahoma* v. *Texas*, 272 U. S. 21, 42–43 (1926); *Vicksburg* v. *Henson*, 231 U. S. 259, 269, 273 (1913).

The District Court did, however, enter final decrees in two quiet title suits that sanctioned the use of § 17. See *United States as Guardian of the Pueblo of Acoma* v. *Arvizo*, Equity No. 2079 (May 14, 1931); *United States as Guardian of the Pueblo of Laguna* v. *Armigo*, Equity No. 2080 (Nov. 2, 1931). The record shows that the defendant railroad in both cases did *not* negotiate new right-of-way agreements with the Pueblos, but simply gathered the old deeds dating back to the 1880's *and successfully submitted them to the Secretary for retroactive validation* without Pueblo approval and without the payment of any new compensation. See 1 Kelly 39–40; 2 *id.*, at 301–313 (Exs. 101–106). As one historian has suggested, "[f]ortunately for the viability of the Pueblo Lands Act, such action was not liberally indulged, otherwise there would have been little reason for the rest of the Act. The Secretary could simply have ratified all of the old deeds by which non-Indians took possession of Pueblo lands." 1 *id.*, at 40–41.

[75] See, *e. g., United States* v. *University of New Mexico*, 731 F. 2d 703, 706 (CA10), cert. denied, 469 U. S. 853 (1984); *Plains Electric Generation & Transmission Cooperative, Inc.* v. *Pueblo of Laguna*, 542 F. 2d 1375, 1376–1377 (CA10 1976); *New Mexico* v. *Aamodt*, 537 F. 2d 1102, 1109, 1111 (CA10 1976), cert. denied, 429 U. S. 1121 (1977); *Alonzo* v. *United States*, 249 F. 2d 189, 194–196 (CA10 1957), cert. denied, 355 U. S. 940 (1958); *Garcia* v. *United States*, 43 F. 2d 873, 878 (CA10 1930); *United States* v. *Board of National Missions of Presbyterian Church*, 37 F. 2d 272, 274 (CA10 1929).

§ 17 in no way authorizes alienation of Pueblo lands.[76]   The
decisions below were merely the most recent applications of
this settled law.   And this settled law not only did not con-
flict with decisions of this Court, but followed directly from
them.[77]

Notwithstanding all of these considerations, the Court
granted certiorari[78] and today holds that the Pueblos are not

---

[76] See, e. g., *United States* v. *University of New Mexico, supra,* at 706
(§ 17 merely "reaffirmed that the Pueblos and their lands were fully under
the guardianship of Congress and the protection of the Nonintercourse
Act"); *Alonzo* v. *United States, supra,* at 195–196 (§ 17 merely "insured
that the restrictions implicit in the decision in United States v. Sandoval
. . . would continue in force"; it "insured that the restrictions which Con-
gress recognized as theretofore existing, with respect to lands owned and
possessed by the New Mexico Pueblos, as a community, should continue,
except in cases where the Pueblos' title had been extinguished, as provided
for in such Act").

The Court's purported concern for deferring to "individuals [who] were
far more likely to have had an understanding of the actual intent of Con-
gress," *ante,* at 254–255, might have been better directed to the panel that
decided *Alonzo.*   Chief Judge Bratton was a former United States Senator
from New Mexico and had sponsored the 1928 Pueblo right-of-way legisla-
tion, see n. 19, *supra,* and the 1933 amendment to § 16 of the Pueblo Lands
Act, see n. 20, *supra.*   Judge Phillips had been one of the two District
Court judges who heard the quiet title suits under the Pueblo Lands Act.
Judge Breitenstein, the third panel member, authored the opinion below in
the instant case.

[77] See, e. g., *United States* v. *Chavez, supra,* at 362–365; *Pueblo of Santa
Rosa* v. *Fall,* 273 U. S., at 320–321 (Nonintercourse Act "appl[ies] here
whether the Indians concerned are to be classified as nomadic or Pueblo
Indians. . . . None of [its] requirements can be dispensed with, and it does
not appear that in respect of most of them there was even an attempt to
comply"); *United States* v. *Candelaria, supra,* at 441 ("While there is no
express reference in the [Nonintercourse Act] to Pueblo Indians, . . . it
must be taken as including them.   They are plainly within its spirit and, in
our opinion, fairly within its words, 'any tribe of Indians'"); *United States*
v. *Sandoval, supra,* at 45–49.

[78] But see this Court's Rules 17.1(a) and (c) (discretionary grant of certiorari
appropriate where, *inter alia,* decision below "has so far departed from the
accepted and usual course of judicial proceedings . . . as to call for an exer-
cise of this Court's power of supervision," "has decided an important ques-

subject to the terms of the Nonintercourse Act and that, under § 17, they may instead "convey good title to [their] lands with the approval of the Secretary of the Interior." *Ante,* at 247. The Court, ironically, has thus come full circle. In *United States* v. *Joseph,* 94 U. S. 614 (1877), the Court exempted the Pueblos from the Nonintercourse Act. As the Court subsequently conceded, that decision rested on assumptions "at variance with other recognized sources of information . . . and with the long-continued action of the legislative and executive departments." *United States* v. *Sandoval,* 231 U. S., at 49. Congress was required to enact the Pueblo Lands Act to resolve the morass that the Court's uninformed and improvident decision in *Joseph* had created. Today, in its first and probably last direct encounter with the Act, the Court once again renders an uninformed, improvident, and sweeping opinion that is "at variance . . . with the long-continued action of the legislative and executive departments." *United States* v. *Sandoval, supra,* at 49. And, once again, Congress most likely will be forced to step in and clean up after the Court's handiwork.

I dissent.

---

tion of federal law which has not been, but should be, settled by this Court, or has decided a federal question in a way in conflict with applicable decisions of this Court." See also Estreicher & Sexton, New York University Supreme Court Project 14–15 (1984) (executive summary) (to be published in 59 N. Y. U. L. Rev. 677, 717–718 (1984) (footnotes omitted)) ("The Court can, and should, establish and police a framework for the delegation and exercise of responsibility to and by lower courts. Except in relatively rare situations justifying immediate intervention, the Court as manager would accord a presumption of regularity and validity to the decisions of state and lower federal courts. A wise manager delegates responsibilities to subordinates and, absent an indication that something is awry, accords their decisions a presumption of validity. To do otherwise is to denigrate the authority of subordinate actors, thereby diminishing their own sense of responsibility and ultimately increasing the manager's tasks as well as the overall workload").