**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee/
      Cross-Appellant,

     v.

SANTO ARRIETA,

      Defendant-Appellant/
      Cross-Appellee.

No. 04-2350, 05-2010

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 00-411 JC)**

---

David N. Williams, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Defendant-Appellant.

Douglas E. Couleur, Santa Fe, New Mexico, for Plaintiff-Appellee.

---

Before **O'BRIEN**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

The conviction in this case turns on whether a road maintained by Sante Fe County, New Mexico, lying between two parcels of land owned by non-Indians but within the exterior boundaries of the Pojoaque Pueblo, where the Pueblo's title has not been extinguished by Congress, is "Indian country" for purpose of the exercise of federal criminal jurisdiction.

## I. Factual and Procedural Background

As a result of an altercation in January 2000, a federal grand jury returned a two-count indictment against Defendant-Appellant Santo Arrieta[1] for committing an assault against an Indian that resulted in serious bodily injury in Indian country, in violation of 18 U.S.C. §§ 113(a)(6) and 1152, and for using a firearm to facilitate a crime of violence, in violation of 18 U.S.C. § 924(c). The alleged crimes occurred on Shady Lane, also known as Santa Fe County Road 105 or Bouquet Lane. Shady Lane is a public road within the exterior boundaries of the Pojoaque Pueblo. It is surrounded on both sides by non-Indian owned land, and is maintained as a county road by Sante Fe County. Congress has not extinguished the Pueblo's title over the land underlying the road.

Mr. Arrieta filed a motion to dismiss his criminal indictment for lack of subject matter jurisdiction, claiming that Shady Lane is not "Indian country" as

---

[1]Between the parties, amici, the district court, and our docketing system, Mr. Arrieta's name has been spelled in four different ways. We have adopted what seems to us the most likely spelling.

defined in 18 U.S.C. § 1151.  The district court denied Mr. Arrieta's motion to dismiss, finding that Shady Lane is part of the Pojoaque Pueblo dependent Indian community and that Congress had not extinguished the Pojoaque Pueblo's title over Shady Lane.  Mr. Arrieta subsequently entered a conditional plea of guilty, reserving the right to appeal the district court's denial of his motion to dismiss.  Mr. Arrieta now appeals his conviction on that ground.

In the plea agreement, the government and Mr. Arrieta agreed on a specific sentence of 60 months, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).  At Mr. Arrieta's sentencing hearing, the district court accepted the plea agreement, including the specific sentence of 60 months, and acknowledged that the agreed upon sentence departed from the recommended guideline range for justifiable reasons.  However, after listening to a statement made by the mother of Mr. Arrieta's girlfriend, learning from defense counsel that the penalty for possession of a firearm under state law would be one year, and reviewing the presentence report, the district court reduced Mr. Arrieta's sentence to one year and one day.  The government filed a cross-appeal challenging the district court's *sua sponte* departure from the agreed upon sentence contained in the plea agreement.

Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM** the conviction and **REMAND** to the district court for resentencing.

-3-

## II.  Discussion

*A.      Subject Matter Jurisdiction*

Mr. Arrieta pleaded guilty to the use of a firearm to commit a violent felony, in violation of 18 U.S.C. § 924(c).  Section 924(c) provides for heightened statutory minimum sentences for "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."  18 U.S.C. § 924(c)(1)(A).  The related crime of violence for which Mr. Arrieta was charged was an assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6).  Section 113(a) establishes the crime of assault "within the . . . territorial jurisdiction of the United States."  *Id.* § 113(a).  Section 113 is extended to Indian country by § 1152, which provides that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country."  *Id.* § 1152.  Federal jurisdiction thus exists over the crimes for which Mr. Arrieta was charged only if Shady Lane—the situs of the crime—was Indian country.  We review the district court's conclusion de novo.  *See United States v. Roberts*, 185 F.3d 1125, 1129 (10th Cir. 1999);

*Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1542 (10th Cir. 1995).

"Indian country" is defined as

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. The government does not contend that Shady Lane is within an Indian reservation or is an Indian allotment, but that it is part of the Pojoaque Pueblo dependent Indian community, the existence of which was recognized in *United States v. Sandoval*, 231 U.S. 28 (1913). Mr. Arrieta contends that the extinguishment of Pojoaque Pueblo lands since *Sandoval* requires us to reexamine whether Shady Lane is a dependent Indian community as that phrase was defined in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998) ("*Venetie*").

1.     *History of the Pueblo Lands*

Title to the lands on which the Pueblo Indians reside was formally granted to them by the King of Spain in 1689. *Sandoval*, 231 U.S. at 39; *United States v. Thompson*, 941 F.2d 1074, 1075 (10th Cir. 1991). In 1848, the United States

-5-

acquired the territory of New Mexico from Mexico, including the lands on which the Pueblo Indians resided. Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat. 922; *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 240 (1985). In the Treaty of Guadalupe Hidalgo, the United States agreed to protect the rights of Indians recognized by prior sovereigns. *New Mexico v. Aamodt*, 537 F.2d 1102, 1111 (10th Cir. 1976). Following this agreement, Congress granted federal protection and supervision to the Pueblo Indians and their lands by extending to the Pueblo the provisions of the Indian Nonintercourse Act, 25 U.S.C. § 177, which prohibits any loss or transfer of title of Indian lands except by treaty or convention. Act of February 27, 1851, ch. 14, § 7, 9 Stat. 587; *United States ex rel Santa Ana Indian Pueblo v. Univ. of N.M.*, 731 F.2d 703, 706 (10th Cir. 1984).

In 1877, however, the Supreme Court held that the Pueblo Indians were not "Indian tribes" within the meaning of the Nonintercourse Act, and therefore could alienate their land without congressional approval. *United States v. Joseph*, 94 U.S. 614, 618 (1876). Although the decision was later overruled, *see United States v. Candelaria*, 271 U.S. 432, 441 (1926), approximately 3,000 non-Indians acquired putative title to Pueblo land between 1880 and 1910. *See Mountain States Tel. & Tel.*, 472 U.S. at 243. The validity of title transferred to non-Indians came into question in 1913 when the Court held in *Sandoval* that the

Pueblo are a dependent Indian community entitled to the aid and protection of the federal government and subject to congressional control. *Sandoval*, 231 U.S. at 47. To settle the status of Pueblo lands, Congress enacted the Pueblo Lands Act of 1924 ("PLA"). Pueblo Lands Act of June 7, 1924, ch. 331, 43 Stat. 636. The PLA established the Pueblo Lands Board ("Board") to resolve conflicting claims to Pueblo lands. *Id.* §§ 2, 6, 43 Stat. at 633-37.

The Board issued patents to quiet title to land in favor of non-Indians who adversely possessed land and paid taxes on the land from 1889 to 1924 or who had color of title to the land from 1902 to 1924. *Id.* § 4, 43 Stat. at 637; *Mountain States Tel. & Tel.*, 472 U.S. at 244-45. The Pueblos' rights to such land were extinguished. PLA § 4, 43 Stat. at 637; *Mountain States Tel. & Tel.*, 472 U.S. at 244. The Pueblo retained title to all lands not patented to non-Indians. Consequently, pockets of privately owned, non-Indian land lie amidst Pueblo lands.

### 2. The Status of Shady Lane

We turn now to the area at issue in this case, Shady Lane. The parties agree that the Pueblo has always held and continues to hold title to the land underlying Shady Lane. The parties likewise acknowledge that the lands surrounding Shady Lane were patented to non-Indians under the PLA, and that the Pojoaque Pueblo's title to those lands has been extinguished. The parties'

disagreement, therefore, is not over who has title to the land, but over whether Shady Lane can be classified as a "dependent Indian community" when it is maintained by Santa Fe County as a county road.

Two requirements must be satisfied for Indian lands to be classified as a "dependent Indian community." First, the lands must have been "set aside by the Federal Government for the use of the Indians as Indian land." *Venetie*, 522 U.S. at 527. This requirement guarantees that the land is actually occupied by an Indian community. *Id.* at 531. Second, the lands must be "under federal superintendence." *Id.* at 527. The latter requirement ensures that the community is dependent on the federal government such that the federal government and the Indians, rather than the states, exercise primary jurisdiction. *Id.* at 531.[2]

Shady Lane, as well as other lands on which the Pojoaque Pueblo reside, was specifically set aside as Indian lands by the federal government. *See Sandoval*, 231 U.S. at 39 (explaining that Congress recognized the Pueblos' title to their lands by statute and that executive orders reserved additional public lands). Although the PLA extinguished the Pueblo's title over some of the land

---

[2]The two-part test established by the Supreme Court in *Venetie* partially replaces our earlier four-part test, enunciated in *Watchman*, 52 F.3d at 1545, for determining whether land constitutes a dependent Indian community. *See HRI, Inc. v. Envtl. Prot. Agency*, 198 F.3d 1224, 1248-49 (10th Cir. 2000) (explaining that the Supreme Court disapproved of the Ninth Circuit's multi-factor test, which was similar to the *Watchman* test, for identifying a dependent Indian community).

that was originally set aside for them, any land where title was not extinguished by the Board remained set aside for use by the Pueblo. Thus, the federal set-aside requirement is satisfied.

Mr. Arrieta rests his argument on the second requirement, that of federal superintendence. He contends that the fact that Shady Lane is maintained by Santa Fe County as a county road precludes our finding that requirement satisfied, despite the Supreme Court's previous holding that the Pueblo are subject to federal superintendence. His argument, however, too narrowly conceives the concept of federal superintendence. We examine the entire Indian community, not merely a stretch of road, to ascertain whether the federal set-aside and federal superintendence requirements are satisfied. *See HRI, Inc. v. Envtl. Prot. Agency*, 198 F.3d 1224, 1249 (10th Cir. 2000); *Watchman*, 52 F.3d at 1542-43. Land owned by an Indian tribe within the exterior boundaries of land granted to the tribe is necessarily part of the Indian community, even if the state performs some services and maintenance with respect to the land. Because the Pojoaque Pueblo possesses title to Shady Lane and Shady Lane is within the exterior boundaries of the Pojoaque Pueblo, it is part of the Pojoaque Pueblo community. The road, like the Pueblo, is therefore subject to federal superintendence. *See Sandoval*, 231 U.S. at 48. Accordingly, we hold that all lands within the exterior boundaries of a Pueblo land grant, to which the Pueblo hold title, are Indian country within the

meaning of 18 U.S.C. § 1151. Shady Lane, located within the exterior boundaries of the Pojoaque Pueblo land grant, is therefore Indian country, and the district court properly exercised jurisdiction over Mr. Arrieta's crime.

3.  *Effect of the 2005 Amendments to the Indian Pueblo Lands Act*

While this appeal was pending, Congress amended the Pueblo Lands Act to clarify federal, state, and Pueblo criminal jurisdiction. *See* Pub. L. No. 109-133, 119 Stat. 2573 (Dec. 20, 2005). The amendment provides, in relevant part:

SEC. 20. CRIMINAL JURISDICTION

(a) IN GENERAL.--Except as otherwise provided by Congress, jurisdiction over offenses committed anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico, shall be as provided in this section.

* * *

(c) JURISDICTION OF THE UNITED STATES.--The United States has jurisdiction over any offense described in chapter 53 of title 18, United States Code, committed by or against an Indian as defined in title 25, sections 1301(2) and 1301(4) or any Indian-owned entity, or that involves any Indian property or interest.

*Id.* We ordered the parties to file supplemental briefs on the retroactivity and implications of this amendment. Both Mr. Arrieta and the government agree that the amendment does not apply retroactively to confer federal jurisdiction over Mr. Arrieta's crime. Because neither party argues the amendment applies to this case,

and because the amendment is consistent with the result we reach under prior law, we need not further consider the amendment.

*B. Departure from Specific Sentence Contained in Plea Agreement*

Mr. Arrieta concedes that the district court had no authority to depart from an agreed upon sentence entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). Where the government agrees to a specific sentence in a plea agreement, such an agreement "binds the court once the court accepts the plea agreement." Fed. R. Crim. P. 11(c)(1)(C); *United States v. Veri*, 108 F.3d 1311, 1315 (10th Cir. 1997) (holding that when a sentencing court accepts a plea agreement containing a specific sentence, "it is bound by the agreement and may not modify it"). The district court accepted Mr. Arrieta's plea agreement and was therefore bound by the 60-month sentence specified in the agreement. Accordingly, we reverse the sentence imposed by the district court and remand with instructions to impose the specific sentence agreed upon in the plea agreement.

### III.  Conclusion

For the foregoing reasons, we **AFFIRM** the district court's finding that federal jurisdiction exists over the assault that occurred on Shady Lane, and thus **AFFIRM** the conviction. We **REMAND** this case to the district court with

instructions to vacate the sentence and to resentence Mr. Arrieta in accordance with the specific sentence agreed upon in the plea agreement.