FRIZZELL, Circuit Judge,
concurring in part, dissenting in part.
In our previous review of this dispute, we stated that “[b]ecause Venetie does not speak directly to the issue, barring en banc review by this court, Watchman, 52 F.3d at 1542-45, continues to require a ‘community of reference’ analysis prior to determining whether land qualifies as a dependent Indian community under the set-aside and supervision requirements of 18 U.S.C. § 1151(b).” HRI, 198 F.3d at 1249.[1] I therefore concur that the doctrine of stare decisis bars this panel from overruling the earlier decision. I further concur that HRI has standing to seek review of the EPA’s Land Status Determination. However, I respectfully disagree with the majority’s conclusion that EPA’s land status determination has an adequate basis in law. Because our precedents do not go so far as to hold that uninhabited, non-Indian land holdings outside a reservation or Pueblo can be part of a small Indian community surrounding a Chapter House located over six miles away, the EPA’s conclusion that the entire Church Rock Chapter is the appropriate community of reference does not have an adequate basis in law. On that issue, I must respectfully dissent.
*1269 As noted in the majority opinion, the land in question is uninhabited and lies outside the Navajo reservation. It is not owned by the Navajo Nation. It is not set aside for Indian use. It is not federally superintended. Petitioner HRI, a non-Indian entity, purchased the land in fee simple from a private company which had purchased the land from the United States. The land falls within the bounds of the Church Rock Chapter, a political subdivision of the Navajo Nation. See 26 Navajo Nation Code § 2(6) (2005). All 56,526.04 acres of land within the Church Rock Chapter lie outside the Navajo Reservation and within the bounds of McKinley County, New Mexico.
The Navajo Nation Council determines the number of certified chapters and the boundaries thereof. The Navajo Nation Code currently provides for a maximum of 110 certified chapters. 26 N.N.C. § 3(B). Additional chapters may be certified upon presentation of evidence of need to the Navajo Nation Council. 26 N.N.C. § 3(C). Eleven of the chapters overlap with the Hopi Reservation because Navajos live on Hopi lands. A chapter, either alone or in conjunction with one to three other chapters, defines a geographical area from which delegates are elected to the Navajo Nation Council. Navajos living within the boundaries of the Church Rock Chapter and the Breadsprings Chapter jointly elect two delegates to the Council. 26 N.N.C. § 10(A). The federal government has no input into the boundaries of the chapters or where Chapter Houses should be located. Boundary disputes between chapters appear to be tribal matters resolved by Navajo Tribal Courts with no involvement by the federal government. See Sweetwater Chapter v. Teec Nos Pos Chapter, 2 Nav. R. 13 (Navajo 1979). Certification of chapters and determination of chapter boundaries is performed solely by the Navajo Nation Council, not the federal government.
We remanded to EPA to conduct a community of reference analysis prior to determining whether the Section 8 land qualifies as a dependent Indian community. See HRI, 198 F.3d at 1249, 1254. On remand, EPA concluded that the appropriate community of reference is the entire Church Rock Chapter. HRI’s primary argument is that community of reference analysis does not survive Venetie, but we cannot deviate from Watchman absent en banc review.
HRI highlights the fact that the Section 8 land is not in close proximity to the Indian community located around the Chapter House, but lies in closer proximity to the 37 sections of land (more than 40% of the Church Roek Chapter) consisting of “rugged mountain ranges, canyons, and highlands” incapable of sustaining a community. As we noted in Watchman, “[a] community is a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life.” Watchman, 52 F.3d at 1544. Here, as in Watchman, the mine site itself does not contain any of this infrastructure. However, our dependent Indian community analysis requires that we focus not on the mine site alone, but “on the community of reference within the context of the surrounding area.” Id. In this case, the evidence may support a conclusion that the community surrounding the Church Rock Chapter House is an appropriate community of reference, but not the entire Church Rock Chapter. The record does not support a conclusion that the Navajo community extends so far from the Chapter House, nor that the political boundaries of the entire Chapter should *1270 have any meaningful bearing on the community of reference determination. Finally, the fact that the Chapter has developed a Chapter planning initiative and land use plan should not be a factor in determining whether it has the authority and jurisdiction to do so relative to particular parcels of property owned by non-Indians in fee simple. The record reflects that McKinley County, New Mexico also has a Comprehensive Plan, which may or may not conflict with that established by the Chapter.
After concluding that the Church Rock Chapter is the appropriate community of reference to which the two-part Venetie test should be applied, the EPA concluded that, because the Church Rock Chapter as a whole qualifies as a dependent Indian community under the federal set-aside and superintendence requirements, the entire Church Rock Chapter—including the Section 8 land lying within—is a dependent Indian community. With today’s application of our community of reference test, we take an unprecedented step. Never before has non-Indian fee land outside the exterior boundaries of a reservation or Pueblo been held to be a dependent Indian community. On one occasion, this court ruled that land outside the bounds of a reservation or a Pueblo in the checkerboard area of western New Mexico was a dependent Indian community, but that land had been purchased with Navajo tribal funds, and HRI suggests that the land was titled in the United States.[2] United States v. Marline, 442 F.2d 1022 (10th Cir.1971). In United States v. Arrieta, 436 F.3d 1246 (10th Cir.2006), we held that land within the exterior boundaries of a Pueblo and to which the Pueblo held title is part of a dependent Indian community. As in Watchman, the Arrieta court examined the entire Indian community, not merely the stretch of land at issue, to ascertain whether the federal set-aside and federal superintendence requirements were satisfied. Id. at 1250. The court observed that “[l]and owned by an Indian tribe within the exterior boundaries of land granted to the tribe is necessarily part of the Indian community, even if the state performs some services and maintenance with respect to the land.” Because the Pueblo possessed title to the land and the land was within the exterior boundaries of the Pueblo, the court concluded that the land was part of the Pueblo community and therefore subject to federal superintendence.
I must respectfully disagree with the finding that the BIA “superintends the Church Rock Chapter” and with the EPA’s determination that “the Chapter is superintended by the federal government.” Instead, the federal government owns or superintends a majority of the lands within the political boundaries of the Church Rock Chapter. The distinction is important, as it more clearly specifies the nature of the federal superintendence. Certain properties within the political boundaries of Chapter are federally superintended, but the Chapter itself is not. The Chapter is merely a political subdivision of the Navajo government. The federal government has no input into its boundaries.
One might legitimately be concerned that our application of the community of reference test could be interpreted as permitting the boundaries of communities of reference to be drawn by Navajo legislation defining tribal political subdivisions. As long as a Chapter as a whole satisfies whatever percentage of federal set-aside and supervision a federal court deems nec *1271 essary, tribal law may itself define the boundaries of Indian country outside the Navajo reservation. In addition to the non-Indian land within the current boundaries of Navajo Chapters, non-Indian land currently outside the boundaries of those chapters may someday be pulled into the “black hole” complained of by HRI and referenced in the majority opinion.[3]
Commentators in this area of the law have noted the “difficult question” presented “when land that qualifies as Indian country outside of a reservation is part of a community interspersed with non-Indian land holdings.” Cohen’s Handbook of Fed. eral Indian Law, 2005 Edition, § 3.04[2][e], In criticizing the Supreme Court of New Mexico for declining to incorporate community of reference analysis into New Mexico caselaw and limiting dependent Indian communities to particular parcels of land that individually meet the set-aside and superintendence tests,[4] the commentators suggest that “a central purpose of the 1948 codification [of 18 U.S.C. § 1151] was to avoid checkerboard jurisdiction. See Seymour v. Superintendent, 368 U.S. 351, 358, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).” Id. at n. 429. A closer look at Section 1151 and Seymour reveals that congressional avoidance of checkerboard jurisdiction is limited to lands within the limits of reservations. In Seymour, the Supreme Court rejected the contention that a parcel of land within the limits of a reservation but held under a patent in fee by a non-Indian was not Indian country. The Court stated “the issue has ... been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151 to include all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent * * Id, at 357-58, 82 S.Ct. 424. Checkerboard jurisdiction on Indian reservations “was avoided by the plain language of § 1151....” Id. at 358, 82 S.Ct. 424. In short, nothing in § 1151 suggests that Congress intended to avoid checkerboard jurisdiction anywhere other than on reservations. Our application of the community of reference test outside the bounds of a reservation has the effect of eliminating checkerboard jurisdiction outside the bounds of a reservation. Thus, our community of reference test, as applied today, runs counter to congressional intent and may cause great jurisdictional uncertainty and disruption in those states where Indian country consists of original allotments and/or trust lands interspersed with non-Indian land holdings.
Although this panel is bound by our precedents to the community of reference analysis undertaken by the EPA, I would hold that the EPA’s conclusion that the entire Church Rock Chapter is the appropriate community of reference is not supported by reasonable, substantial and pro *1272 bative evidence considering the record as a whole.

. In our earlier review we noted that Venetie "reduced substantially” the weight to be afforded the second and third prongs of the four-part test adopted in Watchman for determining whether a given community of reference constitutes a dependent Indian community. HRI, 198 F.3d at 1232, n. 3. Those two prongs are “(2) ‘the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,’; [and] (3) whether there is ‘an element of cohesiveness .. . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,’..." Watchman, 52 F.3d at 1545 (quoting U.S. v. State of South Dakota, 665 F.2d 837, 839 (8th Cir.1981)). Although we recognized the limited relevance of the two prongs, we continue to require a community of reference analysis which affords them substantial weight and effect. The two Watchman factors whose weight Venetie did not reduce—"(1) whether the United States has retained ‘title to the lands which it permits the Indians to occupy’ and 'authority to enact regulations and protective laws respecting this territory,’ ... and (4) ‘whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples],]' ”—are in essence the set-aside and superintendence requirements required by Venetie. I agree, however, that this panel lacks the authority to overturn Watchman and IIRI.

. Although the court did not address set-aside in its opinion, HRI reports the United States’ appeal brief in that case states that “title [was] in the United States (Tr. 89) and on United States land the Indians are permitted to use.”

. Under tribal law, the Navajo Nation Council may extend the political boundaries of those Chapters lying on the outer fringe of the contiguous region comprising the "Navajo Chapters and Election Communities” (as well as the Ramah, Alamo and Canoncito Chapters, which lie southeast of, and unconnected with, the other Chapters). By virtue of today's decision, if such extensions occur, and if a federal court determines that the Chapter as extended satisfies the requisite percentage of federal set-aside and supervision, it may be possible to extend Indian country' onto non-reservation, non-Indian land holdings presently outside Chapter boundaries.

. See State v. Frank, 132 N.M. 544, 52 P.3d 404, 409 (2002). See also State v. Quintana, 143 N.M. 535, 178 P.3d 820, 822 (2008). The Ninth Circuit also rejected its multi-factor balancing test in favor of the Supreme Court's narrow definition of dependent Indian communities. Blunk v. Arizona Dept. of Transp., 177 F.3d 879, 883 (9th Cir.1999).