**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 29, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY RESERVATION,

    Plaintiff - Appellant

v.

MYTON, a municipal corporation,

    Defendant - Appellee,

and

DUCHESNE COUNTY, a political
subdivision of the State of Utah;
ROOSEVELT CITY, a municipal
corporation; DUCHESNE CITY, a
municipal corporation; UINTAH
COUNTY, a political subdivision of the
State of Utah; WASATCH COUNTY;
GARY HERBERT, in his capacity as
Governor of Utah; SEAN D. REYES, in
his capacity as Attorney General of Utah,

    Defendants.----------------------------

UNITED STATES OF AMERICA; THE
STATE OF UTAH,

    Amici Curiae.

No. 15-4080
(D.C. No. 2:75-CV-00408-BSJ)
(D. Utah)

_____

**ORDER**
_____

Before **GORSUCH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

This matter is before the court, *sua sponte*, to amend one sentence on page 17 of the court's August 9, 2016 decision. A copy of the amended Opinion with the change to page 17 is attached to this order. The clerk is directed to reissue the Opinion forthwith and *nunc pro tunc* to the original filing date.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 9, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

UTE INDIAN TRIBE OF THE
UINTAH AND OURAY
RESERVATION,

      Plaintiff - Appellant,

v.

MYTON, a municipal corporation,

      Defendant - Appellee,

and

DUCHESNE COUNTY, a political
subdivision of the State of Utah;
ROOSEVELT CITY, a municipal
corporation; DUCHESNE CITY, a
municipal corporation; UINTAH
COUNTY, a political subdivision of
the State of Utah; WASATCH
COUNTY; GARY HERBERT, in his
capacity as Governor of Utah; SEAN
D. REYES, in his capacity as Attorney
General of Utah,

      Defendants.

------------------------------------------------

UNITED STATES OF AMERICA;
THE STATE OF UTAH,

      Amici Curiae.

No. 15-4080

---

**Appeal from the United States District Court
for the District of Utah
(D.C. Nos. 2:75-CV-00408-BSJ and 2:13-CV-00276-BSJ)**

Frances C. Bassett and Jeffrey S. Rasmussen (Thomas W. Fredericks and Jeremy J. Patterson, with them on the briefs), Fredericks Peebles & Morgan LLP, Louisville, Colorado, for Plaintiff-Appellant.

J. Craig Smith (Clark R. Nielsen, Stephen L. Henriod, and Brett M. Coombs, with him on the brief), Smith Hartvigsen, PLLC, Salt Lake City, Utah, for Defendant-Appellee.

Gina L. Allery, Attorney, Environmental and Natural Resources Division of the United States Department of Justice, Washington, D.C. (John C. Cruden, Assistant Attorney General, and Jennifer S. Neumann, Attorney, Environmental and Natural Resources Division of the United States Department of Justice, Washington, D.C., Barbara Coen, United States Department of the Interior, Washington, D.C., and Grant Vaughn, United States Department of the Interior, Salt Lake City, Utah, with her on the brief), for amicus curiae United States, in support of Plaintiff-Appellant.

Sean D. Reyes, Attorney General, Randy S. Hunter and Katharine H. Kinsman, Assistant Attorneys General, Tyler R. Green, Solicitor General, and Stanford E. Purser, Deputy Solicitor General, State of Utah, Salt Lake City, Utah, for amicus curiae State of Utah, in support of Defendant-Appellee.

Before **GORSUCH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

**GORSUCH**, Circuit Judge.

We're beginning to think we have an inkling of Sisyphus's fate. Courts of law exist to resolve disputes so that both sides might move on with their lives. Yet here we are, forty years in, issuing our seventh opinion in the *Ute* line and still addressing the same arguments we have addressed so many times before.

Thirty years ago, this court decided all boundary disputes between the Ute Indian Tribe, the State of Utah, and its subdivisions. The only thing that remained was for the district court to memorialize that mandate in a permanent injunction. Twenty years ago, we modified our mandate in one respect, but stressed that in all others our decision of a decade earlier remained in place. Once more, we expected this boundary dispute to march expeditiously to its end. Yet just last year the State of Utah and several of its counties sought to relitigate those same boundaries. And now one of its cities tries to do the same thing today. Over the last forty years the questions haven't changed — and neither have our answers. We just keep rolling the rock.

*

To understand how this very old fight arrives back before us today, a brief dip into Western history helps. Beginning in the 1860s and under pressure to make way for incoming settlers, the federal government forced members of the Ute Indian Tribe in Utah onto a new reservation. Like most reservations established around that time, the land the Utes received represented but a portion of their historic lands and pretty undesirable land at that. *See* Floyd A. O'Neil, *The Reluctant Suzerainty: The Uintah and Ouray Reservation*, 39 Utah Hist. Q. 129, 130-31 (1971). But, as these things often went, as the decades wore on and settlement pressures continued to increase the Tribe's land began to look a good deal more alluring. *See id.* at 137-38. By 1905, Congress authorized the

Secretary of the Interior to break up the Ute reservation by assigning individual plots to individual tribal members and allotting any land left over (and a very great deal was sure to be left over) to interested homesteaders. In exactly this way, massive swaths of former Ute reservation lands passed back into the public domain. *See generally Ute Indian Tribe v. Utah* (*Ute I*), 521 F. Supp. 1072, 1092-1127 (D. Utah 1981).

That is, until 1945. Instead of disassembling reservations, Congress by now wished to reassemble them. While by this point the former Ute reservation had been opened to nontribal settlement for forty years, large portions still remained unclaimed and sitting in the hands of the Secretary of the Interior. With Congress's permission, the Secretary in 1945 issued an order returning these unallotted lands, about some 217,000 acres, to tribal jurisdiction. *See* Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984; Order of Restoration, 10 Fed. Reg. 12,409 (Oct. 2, 1945); *Ute Indian Tribe v. Utah* (*Ute II*), 716 F.2d 1298, 1312-13 (10th Cir. 1983).

The litigation surrounding these events and their upshot began in earnest in 1975. That year the Ute Tribe filed a lawsuit in federal court, alleging that the State of Utah and several local governments were busy prosecuting tribal members for crimes committed on tribal lands, even though (constitutionally supreme) federal law generally assigns criminal enforcement responsibilities in "Indian country" to federal and tribal officials, not state or local ones. *See* 18

U.S.C. §§ 1151-1152, 1162; *Cheyenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980).  For their part, the State and its subdivisions responded that the lands in question didn't qualify as Indian country because the 1905 legislation that opened reservation lands to outside settlement had the effect of diminishing or disestablishing the Utes' reservation.  *See Ute I*, 521 F. Supp. at 1075-79.

It took a decade and an exhaustive adversarial process, but in 1985 this court finally resolved the issue *en banc* in a case the parties call *Ute III*.  This court sided with the Tribe and, in a nutshell, held that *all* lands encompassed within the original Ute reservation boundaries established beginning in the 1860s — including all those lands that passed to non-Indian settlers between 1905 and 1945 — remained Indian country subject to federal and tribal (not state and local) criminal jurisdiction.  *See Ute Indian Tribe v. Utah* (*Ute III*), 773 F.2d 1087, 1088-89, 1093 (10th Cir. 1985) (en banc), *cert. denied*, 479 U.S. 994 (1986).  After the Supreme Court denied certiorari, that might have seemed the end of it.  After all, *Ute III* "disposed of all boundary questions at issue on the merits" and "left nothing for the district court to address [on remand] beyond the ministerial dictates of the mandate."  *Ute Indian Tribe v. Utah* (*Ute V*), 114 F.3d 1513, 1521 (10th Cir. 1997) (internal quotation marks omitted).

But that was not the end of it.  That was not even the beginning of the end of it.  Dissatisfied with the result of *Ute III*, state and local officials went

shopping for a "friendlier forum" in which to "relitigate the boundary dispute." United States' Mem. in Support of Ute Indian Tribe's Mot. for Injunctive Relief 3, Supp. App. 8 (Nov. 23, 1992). And no doubt correctly sensing it would represent their best chance for victory, they chose "[a]s a vehicle for their effort" state court prosecutions of tribal members whose unlawful conduct occurred on former reservation lands that had passed to nontribal settlers between 1905 and 1945. *Ute Indian Tribe v. Utah* (*Ute VI*), 790 F.3d 1000, 1003 (10th Cir. 2015); *see also State v. Perank*, 858 P.2d 927, 934 (Utah 1992). Never mind that *Ute III* held that these very lands qualified as Indian country, where Utah and its subdivisions lacked criminal law enforcement authority over tribal members. 773 F.2d at 1088-89, 1093. Never mind, too, the normal operation of issue or claim preclusion principles. State officials argued to Utah state courts that their prosecutions could proceed because the 1905 legislation carved out from Indian country at least those lands that had passed to nontribal members between that year and 1945. *See Perank*, 858 P.2d at 934. Ultimately, the Utah Supreme Court agreed with this much. *See id.* at 953; *State v. Hagen*, 858 P.2d 925, 925-26 (Utah 1992). And so did the U.S. Supreme Court in *Hagen v. Utah*, 510 U.S. 399 (1994). *See id.* at 421-22.

That twist of events required this court to reconsider *Ute III*'s mandate in light of *Hagen*. On the one hand, "[u]psetting a final decision by recalling and modifying a mandate is and ought to be a rare and disfavored thing in a legal

system that values finality." *Ute VI*, 790 F.3d at 1004. On the other hand, if left untouched, *Ute III*'s mandate invited a pretty unsavory result: the possibility that the Supreme Court's decision in *Hagen* would be left to "control only cases arising from Utah state courts and not federal district courts." *Id.* To avoid that outcome, this court took the extraordinary step of recalling and modifying *Ute III*'s mandate a decade after its issuance "to reconcile [the] two inconsistent boundary determinations and to provide a uniform allocation of jurisdiction among [the] separate sovereigns." *Ute V*, 114 F.3d at 1523.

This was no easy task. After carefully reviewing the possibilities, Judge Tacha, writing for the court in a decision the parties call *Ute V,* held that a full and proper respect for *Hagen* meant that this court now had to recognize that "lands that passed from [tribal] trust to fee status pursuant to non-Indian settlement" between 1905 and 1945 do *not* qualify as Indian country. *Id.* at 1529; *see also id.* at 1530. At the same time, Judge Tacha declined to read *Hagen* as affecting *Ute III*'s mandate in any other respect. So, for example, she explained that lands that could've been but were not allotted to nontribal members between 1905 and 1945, and that were instead restored to tribal status in 1945, remained Indian country. *Id.* at 1528-31; *see also Ute VI*, 790 F.3d at 1004. With that much decided, *Ute V* (once again) resolved all outstanding boundary issues, leaving to the district court nothing but the ministerial task of entering a permanent injunction memorializing its terms. *See Ute V*, 114 F.3d at 1530-31.

Once more, too, the Supreme Court denied certiorari. 522 U.S. 1107 (1998). And with that, you could be forgiven for thinking that surely, now, the saga was about to draw to a close as the century neared its end.

Not even close. After this court issued *Ute V* and its light, the parties entered into a series of agreements under the district court's superintendence that seemed to keep the peace — even for some years after major portions of them expired in 2008. But then, much as they did in the build-up to *Hagen*, Utah and several of its counties began what appeared to the Tribe to be a campaign to undermine this court's boundary determinations by prosecuting tribal members for crimes committed "on the very lands *Ute V* said remain Indian country even after *Hagen*." *Ute VI*, 790 F.3d at 1004. Unsurprisingly, the Tribe responded to this effort by filing suit once more in 2013 and by requesting a permanent injunction to enforce the terms of *Ute III* and *V*. As a first step toward that end, the Tribe sought a preliminary injunction halting the prosecution of one tribal member for alleged traffic offenses on land that "*Ute III* and *V* recognized as Indian country." *Id.* at 1005. Yet in a one-line order that contained no explanation, the district court denied the request.

So it is that just last year the rock returned for this court to push up the hill one more time. In *Ute VI*, we found that the land at issue in the prosecution in question unquestionably qualified as Indian country under the terms of *Ute V* and that Utah and the localities were indeed attempting to "undo the tribal boundaries

settled by *Ute III* and *V*." *Id.* Accordingly, this court ordered the district court to issue the preliminary injunction forthwith. *Id.* ("[T]he district court should have issued a preliminary injunction and *must do so now* . . . ." (emphasis added)). "[T]he time has come," we said, for the parties "to respect the peace and repose promised by settled decisions." *Id.* at 1013. Again the Supreme Court denied review. 136 S. Ct. 1451 (2016).

Yet even that wasn't the end of it. While *Ute VI* was before this court, one of the defendants, the town of Myton, filed a motion to dismiss the Tribe's suit. Even though the Tribe's complaint alleged that Myton lies on original Ute reservation lands and includes tracts that were opened in 1905 but never settled and so restored to tribal jurisdiction in 1945. And even though the Tribe's complaint alleged that the town and its agents sought to prosecute tribal members for crimes on those restored tribal lands. Despite all this, Myton sought dismissal and the district court granted it, certifying its disposition for appeal under Fed. R. Civ. P. 54(b). And so with that we face the rock and the hill yet again, with the Tribe and the federal government asking us to give effect to *Ute V*'s mandate by overturning the district court's ruling.

*

We are of course obliged to do exactly that. The Tribe's suit against Myton alleges that local officials seek to exercise criminal jurisdiction over tribal members on lands that were restored to tribal jurisdiction in 1945. Lands that,

- 9 -

accordingly, remain Indian country under the express terms of *Ute V* and so qualify as lands where tribal members are generally subject only to federal and tribal criminal authorities.

To be sure, Myton disputes the facts alleged in the complaint. It contends that not a single bit of land within its boundaries was subject to the 1945 restoration order. But if Myton really wishes to dispute the facts alleged in a complaint, a motion to dismiss surely isn't the proper way to go about it. At the motion to dismiss stage we and the district court must construe all well-pleaded factual allegations in the light most favorable to the non-movant and ask only if they state a plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And the Tribe's factual allegation that Myton includes land that qualifies as Indian country under the terms of *Ute V* is a good deal more than plausible. Indeed, it is undisputed that Myton lies on land that was part of the Tribe's original reservation. *See* Aple. Br. at 4 ("Myton City . . . is encompassed by the historic boundaries of the Uintah Valley Indian Reservation . . . ."). The town's own plan and plat acknowledge that even today "approximately 48%" of the town's geographic space remains tribal "trust lands." Myton City General Plan FY 2006, at 12; *see also id.* at fig.2. And when in 1947 the town sought to purchase certain parcels of land within the townsite's boundaries so that it might build an airport, the U.S. Department of the Interior refused the sale, citing its judgment that the tracts in question had been "irrevocab[ly]" restored to tribal

jurisdiction in 1945. App. vol. XIV at 2087-88. So it seems Myton's response to this appeal is really no response at all.

Of course, that's not Myton's only reply. The town also argues that the Supreme Court's decision in *Hagen* requires the dismissal of this suit. In particular, it points to a sentence in which the Court stated that "the town of Myton, where petitioner committed a crime, is not in Indian country." 510 U.S. at 421. But though perhaps appealing on first encounter, on closer inspection this argument proves no more persuasive than the last.

After all and as we've seen, any dispute over the meaning and effect of *Hagen* was itself finally decided by this court a very long time ago. As *Ute V* recognized, *Hagen* addressed the question whether state officials had the power under federal law to prosecute a particular crime by a particular defendant — a question whose answer turned on whether the particular parcel of land where the crime occurred (Mr. Hagen's home in Myton) was or was not Indian country. *See Ute V*, 114 F.3d at 1518-19; *see also* 18 U.S.C. § 1151; *United States v. Arrieta*, 436 F.3d 1246, 1247 (10th Cir. 2006); *United States v. Martine*, 442 F.2d 1022, 1023 (10th Cir. 1971). The Supreme Court *held* that particular parcel was not Indian country, so state officials could lawfully prosecute Mr. Hagen. *See Hagen*, 510 U.S. at 421-22. Of course, *Hagen*'s *reasoning* or *ratio decidendi* extended further, for the Court made plain that its holding rested on the judgment that all parcels of land transferred to nontribal members between 1905 and 1945 are not

Indian country — and that Mr. Hagen's home sat on such a parcel. *See id.* at 414. And in *Ute V*, this court sought to give full effect not just to *Hagen*'s holding but to its reasoning too, revising *Ute III*'s mandate to reflect that *all* former reservation lands transferred to nontribal members between 1905 and 1945 no longer qualified as Indian country. *See Ute V*, 114 F.3d at 1528, 1530. But, as interpreted by *Ute V*, *Hagen* didn't hold that each and every tract of land inside Myton is outside Indian country and didn't purport to supply reasoning that might support such a rule. *See id.* at 1530. Myton might disagree with *Ute V*'s assessment on this score and believe "that *Ute V* drew the wrong boundaries." *Ute VI*, 790 F.3d at 1012. But Judge Tacha's careful interpretation of *Hagen* in *Ute V* dates back nearly twenty years, the Supreme Court has twice declined to disturb its judgment, and we are not free to tinker with that controlling precedent now. *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993); *Tokoph v. United States*, 774 F.3d 1300, 1303-04 (10th Cir. 2014). Neither, for that matter, does Myton dispute that it is in privity with the parties to *Ute V* or identify any other reason that might prevent that decision from binding it not just as a matter of precedent but as a matter of issue preclusion too.

Though it's long since water over the dam, both as a matter of precedent and preclusion, we might add our view that *Ute V*'s interpretation of *Hagen*'s rule and reasoning was entirely correct. Every bit of evidence suggests that the Supreme Court meant to remove from *Ute III*'s determination about the scope of

Indian country those lands (and only those lands) allotted to nontribal members between 1905 and 1945. Indeed, the Utah Supreme Court decisions under review in *Hagen* didn't purport to hold differently. As *Hagen*'s companion case, *Perank,* made clear, the "only issue" the Utah Supreme Court sought to resolve was "whether the unallotted and unreserved lands that were opened to entry in 1905 *and not later restored to tribal ownership and jurisdiction* [in] 1945" qualified as Indian country. 858 P.2d at 934 (emphasis added). Neither did the State of Utah seek a different rule before the U.S. Supreme Court. In its briefing, Utah expressly acknowledged that "[t]here is no dispute that . . . the surplus lands restored to tribal ownership and reservation status in 1945 . . . are also Indian country." Br. for the Resp't, *Hagen*, 510 U.S. 399 (No. 92-6281), 1993 WL 384805, at *9. An acknowledgment the State repeats even today in the amicus brief it tenders otherwise in support of Myton. Br. of Utah as Amicus Curiae at 3 ("After explaining the effect of the 1945 and 1948 restorations, the State [in *Hagen*] reiterated there was no dispute that the tribal reserves, remaining allotments and restored lands were all Indian country."). In this light, it is evident that the Supreme Court's mention of the town of Myton in *Hagen* was no more than a shorthanded reference to the situs of the crime, a parcel of land inside the town of Myton that had been allotted to a nontribal member between 1905 and 1945, and thus a parcel of land that failed to qualify as Indian country under the Court's reasoning. No one before the Court sought a ruling that *all* of Myton is

outside Indian country.  That question simply wasn't presented.  And nothing in the parties' arguments to the Court or the reasoning of the Court's opinion would support such an idiosyncratic rule.  So it is *Ute V*'s interpretation of *Hagen* is not only plainly controlling:  it seems to us plainly correct.

As a final measure, Myton appeals to equity.  It laments the consequences for the town's administration that follow from having to contend with some parcels in town where it cannot exercise criminal jurisdiction over some persons.  But this sort of "checkerboard" jurisdiction — where state and local officials bear criminal enforcement power on some lands and federal and tribal officials oversee others — is the natural consequence of Congress's decision to open and then close reservation lands to outside settlement.  Neither would a victory for Myton eliminate the checkerboard that already exists in former Ute reservation lands:  it would only alter the shape of the board in one relatively small and peculiar way, a way that would defy the shape dictated by *Ute III* and *V* more than a generation ago, and we see no equity in that.  For that matter, checkerboard jurisdiction is a fact of daily life throughout the West, the result of many different congressional commands like those at issue here, and something many localities have lived with successfully.  Myton offers no reason to think it has not done or cannot do the same.  Surely, too, it is not for this court to override Congress's commands on the basis of claims of equity from either side.  *See Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1158 (10th Cir. 2010) (en banc) ("[A]s this court has previously explained,

Congress has authorized checkerboard jurisdiction under its definition of Indian country in 18 U.S.C. § 1151." (internal quotation marks omitted)).

By way of equity Myton finishes with an appeal to the doctrine of laches. That doctrine may be used as a matter of judicial discretion to vindicate "justifiable expectations" threatened by the untimely assertion of long dormant claims. *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 215 (2005) (internal quotation marks omitted). Because the Tribe waited so long to assert claims against it, Myton submits, the town has long since and fairly come to expect that it contains no tribal lands qualifying as Indian country.

We don't see how. For one thing, the lands that reverted to the Tribe in 1945 are owned by the United States and held in trust for the benefit of the Tribe. Br. of United States as Amicus Curiae at 4. And given this, it is far from clear whether the doctrine of laches could be used to determine the fate of this territory, for laches is a line of defense that usually may not be asserted against the United States. *See Guar. Trust Co. v. United States*, 304 U.S. 126, 132 (1938). For another thing, we don't see how the town might have ever justifiably thought that it contained *no* lands qualifying as Indian country. As we've seen, the Department of the Interior long ago explained its view that the 1945 restoration order had the effect of returning to the Tribe's jurisdiction lands within the town's limits. As we've seen, too, when local governments started to assert jurisdiction over tribal members on tribal lands about thirty years ago, the

- 15 -

Tribe brought a suit to challenge their actions — and no one disputes that the Tribe did so in a timely manner.  Since then, the Tribe has consistently defended its jurisdiction over lands throughout the original Ute reservation territories — lands that include Myton.  Indeed, the Tribe has won two separate judgments (*Ute III* and *V*) holding (first) that *all* and (then) that *some* of Myton is inside Indian country.  What's more, in previous iterations of this dispute, in *Hagen* itself, and again in this case, both the State of Utah and Myton's county (Duchesne) have accepted that the 1945 order restored tribal jurisdiction over unallotted former reservation lands like those in Myton.  *See Perank*, 858 P.2d at 949; *Ute II*, 716 F.2d at 1312-13; Br. for the Resp't, *Hagen*, 510 U.S. 399 (No. 92-6281), 1993 WL 384805, at *9; Br. of Utah as Amicus Curiae at 3.  On this record, Myton's claim to have long and justifiably expected that its town contains no Indian country simply cannot withstand scrutiny.  *Cf. City of Sherrill*, 544 U.S. at 214, 221 (approving laches on a very different record where the land was sold to nontribal members and neither the tribe nor the federal government did anything to assert their rights "[f]rom the early 1800's into the 1970's").

Before we finish rolling the rock up the hill, one more issue remains to confront.  The Tribe has filed a motion seeking the reassignment of this and related cases to a different district judge on remand.  Absent proof of bias, reassignment is, of course, a step this court takes only in "extreme circumstances."  *Procter & Gamble Co. v. Haugen*, 427 F.3d 727, 744 (10th Cir.

- 16 -

2005) (internal quotation marks omitted). But we think those exist here. The unavoidable fact is that nearly twenty years ago in *Ute V* this court explained that, between *Ute III* and its own disposition, "all boundary questions at issue" had been finally resolved. *Ute V*, 114 F.3d at 1521. Even so, the years since seem to have brought nothing but relitigation of those boundaries. *See, e.g.*, *Ute VI*, 790 F.3d at 1005. Utah and its subdivisions bear responsibility for much of this. We have even had to take the extraordinary step of reminding them, parties who should (and do) know better, of the possibility of sanctions if they continue to defy settled judicial mandates. *Id.* at 1013. But the fact remains that the district court has failed to give effect to this court's mandate in *Ute V* and has given us little reason to hope that things might change on remand or that this long lingering dispute will soon find the finality it requires. Accordingly, while we see no sign of bias in this case, we conclude reassignment of this and all related disputes is required to ensure their just and timely resolution. *See, e.g.*, *Leoff v. S & J Land Co.*, 630 F. App'x 862, 864, 866 (10th Cir. 2015) (reassigning for failure to "comply strictly with the mandate" issued by this court); *United States v. Gupta*, 572 F.3d 878, 892 (11th Cir. 2009) (same).

*

The district court's order granting Myton's motion to dismiss is reversed. This case and all related matters shall be reassigned to a different district judge.

The court and parties are directed to proceed to a final disposition both promptly and consistently with this court's mandates in *Ute V*, *Ute VI*, and this case.